# Exhibit 1

| **SUMMONS AND ORDER OF NOTICE** | DOCKET NUMBER<br>**2281CV01755** | **Trial Court of Massachusetts**<br>**The Superior Court** |
|---|---|---|
| CASE NAME:<br>**Cognex Corporation vs. Justin Brown** | | Michael A. Sullivan, Clerk of Court<br>Middlesex County |
| To:<br>**Justin Brown** | | COURT NAME & ADDRESS<br>Middlesex County Superior Court - Woburn<br>200 Trade Center<br>Woburn, MA 01801 |

To the above named defendant(s):

      You are hereby summoned and required to serve upon:

> **Lauren C Schaefer, Esq.**
> **ArentFox Schiff LLP**
> **800 Boylston St 32nd Floor**
> **Boston, MA 02199**

      an answer to the complaint which is herewith served upon you. This must be done within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, Judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this Court at Woburn either before service upon plaintiff's attorney or within a reasonable time thereafter.

      Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

**WE ALSO NOTIFY YOU** that application for a Preliminary Injunction has been made in said action, as it appears in the complaint. A hearing on this matter has been scheduled for:

**Date:** 04/06/2022

**Time:** 02:00 PM

**Event:** Hearing on Preliminary Injunction

**Session Location:** Civil J Rm 520 /

at which time you may appear and show cause why such application should not be granted.

| DATE ISSUED<br>**03/28/2022** | CHIEF JUSTICE OF THE SUPERIOR COURT<br>Witness:<br>**Hon. Heidi E Brieger** | ASSOCIATE JUSTICE<br>**Hon. Douglas H Wilkins** | ASSISTANT CLERK<br>X |
|---|---|---|---|

**RETURN OF SERVICE**

I hereby certify and return that on _____, I served a copy of this summons, together with a copy of the Complaint.

PARTY NAME:

X

COMMONWEALTH OF MASSACHUSETTS
THE TRIAL COURT
SUPERIOR COURT DEPARTMENT

MIDDLESEX, ss.                              CIVIL ACTION NO. 22-1755

COGNEX CORPORATION,
                Plaintiff,

v.

JUSTIN BROWN,
                Defendant.



FILED
IN THE OFFICE OF THE
CLERK OF COURTS
FOR THE COUNTY OF MIDDLESEX

MAR 28 2022

CLERK

### COMPLAINT AND JURY DEMAND

Plaintiff Cognex Corporation ("Cognex" or the "Company") brings this action against

Justin Brown ("Brown"), its former Senior Vice President, Global Logistics Sales, for violation of

his confidentiality, non-competition and non-solicitation obligations set forth in his Employee

Invention, Non-Disclosure and Non-Competition Agreement (the "Agreement"). Cognex seeks

damages for Brown's breaches of contract and seeks a declaratory judgment regarding Brown's

obligations under the Agreement. Cognex also seeks a preliminary and permanent injunction to

prevent Brown's further breaches of the Agreement.

As set forth in greater detail below, the Agreement provides that, upon his separation from

Cognex, Brown may not, among other things, accept employment with a competitor (as defined in

the Agreement) for eighteen (18) months, solicit business from customers of Cognex for eighteen

(18) months with which Brown had material contact in the two (2) years prior to his departure

from Cognex, or use Cognex's confidential information. Despite Brown's clear and unambiguous

obligations to Cognex, acknowledged and reaffirmed in writing by Brown on February 25, 2022,

Cognex has become aware that Brown, who resigned from Cognex as of March 1, 2022, has

accepted a position with a competitor of Cognex (as defined in the Agreement), Covariant, Inc. ("Covariant"), as the Head of Sales.

By virtue of Brown's employment with Covariant, Brown is engaged in an ongoing violation of the non-competition provision of his Agreement and, upon information and belief, the non-solicitation and confidentiality provisions of his Agreement. Brown acknowledged in executing the Agreement that such violations of the terms of the Agreement shall result in immediate and irreparable injury to Cognex and that Cognex shall be entitled to obtain injunctive relief to enforce the terms of the Agreement.

Cognex has demanded that Brown cease and desist from his ongoing activities in breach of the Agreement. Brown has not responded substantively to the demand and has refused to agree to curtail his activities in breach of the Agreement while this matter is adjudicated.

## PARTIES

1. Cognex is a Massachusetts corporation with its principal place of business at 1 Vision Drive, Natick Massachusetts 01760.

2. Brown is an Arizona resident with an address at 37310 N 104th Place, Scottsdale, Arizona 85262.

## JURISDICTION AND VENUE

3. This court has jurisdiction over this matter pursuant to M.G.L. c. 223A, § 3.

4. Venue is proper in Middlesex County pursuant to c. 223, § 8 because Cognex has a usual place of business in Middlesex County.

## FACTS

### COGNEX'S BUSINESS

5.      Founded in 1981, Cognex is a world leader in the field of machine vision.

6.      Cognex is headquartered in Natick, Massachusetts, and has regional offices and distributors located throughout the world.

7.      Cognex designs, develops, manufactures and markets a range of products that incorporate sophisticated machine vision technology, allowing robots and other fixtures the ability to guide, gauge, inspect, identify and assure the quality of items during the manufacturing and distribution process.

### COGNEX'S PROTECTION OF ITS CONFIDENTIAL INFORMATION

8.      Because its intellectual property, including trade secrets and other proprietary information, is a critical component of Cognex's commercial success and economic advantage, the Company focuses significant resources on developing and maintaining Confidential Information (as defined below and in the Agreement) and guarding it from disclosure.

9.      Due to the extremely competitive nature of the machine vision industry, Cognex takes extensive measures to protect its confidential information and trade secrets by, among other things, requiring keycard access to physical sites and buildings, password-protecting and encrypting its computers, email accounts, and other systems, limiting access to information (electronically and physically) to those with a need to know, identifying confidential information on its face as confidential and regularly communicating to employees that confidential information is to be kept confidential. Cognex's intellectual property is also protected by more than 1,000 patents and applications.

3

10.     With respect to Cognex's highly sensitive strategic planning materials, the audience is carefully selected and limited. Information concerning strategic planning resides on a restricted site in the Microsoft Teams environment. Only those with a need to know have access to the information. Company executives are thoughtful about who is invited to meetings where confidential, strategic information will be discussed and remind participants at the beginning of these meetings that the discussion will be highly confidential. Specifically, with respect to Cognex's "three-year plans," if individual employees wish to share information outside of the approved group, the disclosure must be approved by the EVP of Vision and ID Products for Cognex.

11.     Cognex also protects its Confidential Information by requiring employees to utilize usernames and passwords to access Confidential Information, only providing Confidential Information to employees on a need to know basis, storing Confidential Information in encrypted locations, and requiring employees as a condition of employment to sign agreements containing non-disclosure obligations and, for appropriate employees, requiring execution of its form Employee Invention, Non-Disclosure, and Non-Competition Agreement.

12.     Access to information is heightened for the sales force in the logistics vertical. Unlike other Cognex offerings which may be more "off the shelf," the logistics vertical is a solutions-based group. In other words, the sales force in the logistics vertical is tasked with communicating frequently with customers to understand their specific business challenges or pain points. Logistics sales employees must then liaise with Cognex's technical teams to install, configure, troubleshoot and sell solutions applicable to customer challenges. Sales employees rely upon their technical backgrounds because they work closely with both Cognex and customer engineers – often over a period of months or years – as they deploy solutions. In essence, the

4

logistics sales force is a conduit for shaping Cognex's technology based on specific customer feedback.

13.     Although Cognex-designed solutions and products may become public once they are released for sale, solutions and products in the pipeline or development phases are incredibly confidential, subject to non-disclosure agreements, restricted to only those within Cognex with a need to know, and kept, in some cases quite literally, behind a locked door and black curtain.

## BROWN'S EMPLOYMENT WITH COGNEX

14.     Brown was first hired by Cognex in 2010 as District Sales Manager for the Western U.S.

15.     Throughout his employment with Cognex, Brown took on increased responsibility over the course of his career.

16.     In January 2020, recognizing Brown's ability to develop relationships with key stakeholders in new markets, Cognex appointed Brown VP, Global Logistic Sales, shifting his responsibilities from factory automation in the Americas to the logistics vertical worldwide.

17.     In May 2021, Brown was promoted to SVP, Global Logistics Sales, the highest-level executive in the logistics sales vertical.

18.     In his roles as VP, Global Logistics Sales and SVP, Global Logistics Sales, Brown became an even more important member of Cognex's senior management team. As of January 1, 2022, Brown began reporting directly to the Company's Chief Executive Officer, Robert Willett ("Willett").

19.     Brown was responsible for establishing and maintaining relationships with Cognex's key logistics customers around the world, identifying customer requirements and pain points, communicating with the product and technical teams concerning strategic and product

planning, and generally steering the global sales operation as it related to one of Cognex's most important growth opportunities, logistics.

20.     Brown's role was global in nature. Brown was responsible for worldwide customers facing logistics-related challenges, which included some of the world's largest brands. By virtue of his role with Cognex, Brown is aware of the unique and specific challenges and opportunities facing customers worldwide, most particularly those customers with whom he worked while at Cognex.

21.     Brown's knowledge of Cognex's Confidential Information is both broad and deep.

22.     Brown has detailed knowledge concerning Cognex's financials, customer pricing, and marketing strategies.

23.     Brown also has inside knowledge about Cognex's three year strategic plan, which is formally revisited on an annual basis each summer, but which is also regularly discussed. Brown was heavily involved in the creation of the overall Cognex strategic plan, with a specific emphasis on Cognex's strategic vision and direction in the logistics vertical.

24.     Similarly, Brown has deep technical knowledge concerning Cognex's product and technology pipeline. Products that are in the pipeline to be commercially released enter a formal "Exit Phase" or "EP" process to help ensure a successful product launch.  The EP process can take one or two years as products are taken from research and development to commercialization. Because of Brown's in-depth knowledge of customer requirements and specifications, Brown was one of the few Cognex sales executives responsible for approving products and solutions within the EP process  Brown met regularly with Joerg Kuechen, Cognex's Senior Vice President of Advanced Vision Technologies, to discuss and brainstorm technical specifications for new technologies.

25.     Critically, as head of sales of one of Cognex's most important verticals, Brown has benefitted from Cognex's goodwill with many of its most important customers, some of which Brown met with on an almost daily basis. For these customers, Brown was the face of Cognex.

26.     Brown did not have any significant relationships with Cognex's key logistics customers before he joined Cognex nearly 12 years ago.

27.     Brown recognized the value of Cognex's goodwill with these customers.  Brown would not allow members of Cognex's business units to meet with key decisionmakers alone.  In hindsight, Brown understood the importance of the relationships he was creating on behalf of Cognex, and that he took steps to ensure that, should he leave, he would be able to benefit from Cognex's goodwill in his new employment.

### THE AGREEMENT

28.     In connection with his hire in May 2010, Brown signed Cognex's then-standard Employee Invention, Non-Disclosure and Non-Competition Agreement, in which he acknowledged that, prior to his employment with Cognex, he did not have any detailed knowledge, experience with, or training in the specification, design, manufacture or marketing of machine vision systems.

29.     Prior to joining Cognex, Brown obtained a Bachelor of Science Degree in Mechanical Design & Engineering and a Masters of Business Administration Degree, both from Purdue University.

30.     On September 9, 2015, Brown executed a further Employee Invention, Non-Disclosure and Non-Competition Agreement.  Following Cognex's amendment of its standard form restrictive covenant agreement, Brown was asked to sign and did sign Cognex's Employee Invention, Non-Disclosure and Non-Competition Agreement on October 24, 2015.

31.     In connection with his most recent promotion, and in exchange for his continued employment with the Company and his associated access to the Company's trade secrets and confidential information, on May 14, 2021, Brown again signed Cognex's Employee Invention, Non-Disclosure and Non-Competition Agreement (the "Agreement"). A copy of the Agreement is attached as Exhibit A.

32.     In the Agreement, Brown agreed, among other things, that:

> during the term of Employee's employment and for the eighteen (18) month period following the effective date of Employee's separation ("Separation Date"), for any reason, from the Company (the "Non-Competition Period"), Employee shall not, directly or indirectly, engage in any Prohibited Activity within the area where Employee performed services for the Company during the two-year period prior to Employee's Separation Date or for any of the Company's Competitors (as defined in Section 1(c) below)…

Agreement, § 1(b) (the "Non-Competition Provision").

33.     For purposes of Section 1 of the Agreement, "Prohibited Activity" is defined to mean "(i) activity engaged in by Employee for a Competitor (as defined below) as an employee, employer, owner, operator manager, advisor, consultant, agent, partner, director, stockholder, officer, volunteer, intern or in any other similar capacity, where the activity is similar to that engaged in by the Employee for the Company; (ii) providing services to a Competitor similar to those performed by Employee on behalf of the Company; and (iii) activity by the Employee that may require or inevitably require disclosure of trade secrets, proprietary information or Confidential Information, as defined below." Agreement, § 1(c).

34.     For purposes of Section 1 of the Agreement, a "Competitor" is defined to mean "a person or entity engaged in the Business of the Company or which provides services or products substantially similar to the Business of the Company." Agreement, § 1(c). The "Business of the

Company" is defined as the "development, marketing, selling or servicing of machine vision systems or bar code readers." Agreement, § 1(a).

36.    Brown also agreed that the restrictions set forth in Section 1 of the Agreement are reasonable and intended to protect Cognex's Confidential Information, relationships with customers and goodwill. Agreement, § 1(e).

36.    In the Agreement, Brown also agreed that for the eighteen-month period following his separation from the Company, he:

> Will not, either on his/her own behalf or on behalf of any person or entity, directly or indirectly: (i) solicit, or attempt to solicit, recruit or hire, any person who is, or was, during the one year period prior to Employee's Separation Date, or is during the Non-Solicitation Period, an employee, consultant or contractor of the Company, to terminate, alter or modify such person's relationship with the Company; (ii) solicit, accept from, or perform for any person or entity that is a customer of the Company as of the Employee's Separation Date, with which Employee had material contact during the two-year period prior to the Separation Date ("Customer") any business of the type performed or which could be performed by the Company for such Customer; or (iii) persuade any Customer to cease doing business with the Company or to reduce the amount or scope of business that such Customer has customarily done or is reasonably expected to do with the Company.

Agreement, § 4(a)(the "Non-Solicitation Provision").

37.    In addition to the Non-Competition and Non-Solicitation provisions of the Agreement to which Brown agreed, the Agreement also contains a confidentiality provision pursuant to which Brown agreed that:

> [D]uring his/her employment with the Company and thereafter, Employee shall not use for his/her own benefit or for the benefit of any other person or entity, divulge, or disclose to anyone except for persons within the Company whose positions require them to know it, any information not already lawfully available to the public

9

concerning the Company or any information constituting a trade secret pursuant to Massachusetts law.

Agreement, § 2.

38.     Pursuant to the Agreement, "Confidential Information" includes:

> any trade secrets, technical data, design, pattern, formular, process, methods, computer program, source code, object code, algorithm, subroutine, manual, product specification, or plan for a new, revised, enhanced, modified or existing product; operational and functional features and limitations of the Company's software or other products; any business, marketing, financial, pricing or other sales-related data; information regarding the present or future business products of the Company; information regarding employees including contact information, employee lists, organizational charts, information concerning particular employee skill sets, technical and business knowledge, and compensation; and any information concerning the particular needs of clients and customers and their buying patterns, price sensitivies, key decision makers (and the contact information for such individuals), product needs, product specifications, request for proposal and the responses thereto.

*Id.*

39.     Brown acknowledged and agreed in entering into the Agreement that the terms of the Agreement are reasonable and required to protect the legitimate business interests of the Company. Agreement, § 7(b).

40.     Brown acknowledged and agreed in entering into the Agreement that any breach of the Agreement by him will "result in immediate and irreparable harm to the Company not compensable by money damages" and that the Company shall be entitled to obtain injunctive relief to enforce the terms of the Agreement.  Agreement, § 7(b).

41.     Pursuant to the Agreement, "[a]ll issues concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by, construed and enforced in accordance with the laws of the State in which Employee has his or her primary residence at the time of signing this Agreement, without giving effect to any choice or conflict or law provision

that would cause the application of the laws of any other jurisdiction. Agreement, § 9(g). Brown's primary residence was in Arizona at the time he signed the Agreement.

42.     In addition to the base salary, commission and commission bonuses that Brown has earned during his employment with Cognex, Brown has received significant equity awards annually, which vest over a period of years. In connection with these equity awards, Brown has been required to reaffirm, by signing equity award agreements ("Equity Award Agreements"), his promise to be bound by the restrictive covenants in his Agreement and to acknowledge that if he commits a breach of the Agreement, he will pay damages to Cognex, including an amount equal to the sum of (a) the total of all pre-tax gains realized by the employee as a result of vesting any portion of the applicable award; and (b) the total of all pre-tax gains realized by the employee as a result of the sale of any shares acquired by the employee through the vesting of any portion of the applicable award.

43.     In recognition of the of the importance of Brown's role to Cognex, during his last full three years of employment (2019-2021), Brown's base salary, commission payments and equity-based awards (vesting over various periods) equaled $834,948, $947,325, and $1,673,822, respectively. In addition, Brown realized a total of $2,982,612 ($1,010,936 in 2019, $1,068,602 in 2020 and $903,073 in 2021) over just this three-year period from the exercise of stock options granted in years prior to the year Brown exercised the options.

## BROWN RESIGNS HIS EMPLOYMENT UNDER FALSE PRETENSES

44.     On or about February 22, 2022, Brown gave formal notice that he would be terminating his employment with Cognex.  Brown's last day at Cognex was March 1, 2022.

45.     In providing his reasons for leaving Cognex, Brown explained, without providing any specifics, that he was facing serious personal challenges, and that he needed to make some immediate changes and to focus on his health.

46.     During the course of his exit interview from Cognex, Brown indicated to Sheila DiPalma, the Executive Vice President of Employee Services and Chief Culture Officer at Cognex ("DiPalma"), that he was experiencing certain personal problems, including health concerns, and that he needed to take time off to take care of himself.  Brown further stated to DiPalma that, while he expected one day to return to the workforce, he would not want to work again at such a high level.

47.     During the exit interview with DiPalma, Brown also mentioned two companies in which he might be interested in working someday - Covariant and Ambi Robotics.  DiPalma, who had limited familiarity with these companies, reminded Brown of his obligations under his Agreement and cautioned Brown that before accepting any such employment, he should discuss doing so with Willett, to whom Brown reported at Cognex, because such employment might be in violation of the terms of his Agreement.

## BROWN BREACHES THE AGREEMENT

48.     On March 21, 2022, less than three (3) weeks after Brown resigned from Cognex for what he purported were health and personal reasons, Cognex learned that, contrary to Brown's statements that he would be taking time off and that any future sales work would be at a lower level, Brown accepted employment with Covariant as the Head of Sales.

49.     Covariant is a robotics and artificial intelligence ("AI") company developing what it terms the "Covariant Brain," a form of universal AI that allows robots to see, reason, and act in the world around them. Covariant's technologies include AI-powered robotic solutions, both hardware and software, which use machine vision systems to "see" items that are picked, packed and shipped from moving lines and shelves in warehouses. According to a recent article on Covariant, attached here as Exhibit B Covariant uses a "proprietary vision system [that] combines cameras and software to provide perception capabilities to robots."

50.     Covariant's website identifies "E-Commerce," "Manufacturing" and "Parcel" among the industries for which it provides "solutions." These are all industries in which Cognex provides logistics solutions for customers.

51.     Unlike Cognex, which was founded in 1981 and has invested substantial time and resources to establish itself as a leader in the field, Covariant, founded in 2017, is a relatively new player to the machine vision and robotics space.

52.     Even if Covariant is using a different approach for its machine vision technology, the problem being solved by both Covariant and Cognex is the same. Moreover, the use of a combination of cameras and software to create a robotic "brain" is precisely the technology that Cognex has been developing for years, and which Brown has been selling as part of solutions for Cognex customers.

53.     It is not possible to separate the robotics portion of Covariant's business from the vision system portion of its business. From a customer perspective, the robotic arm probably constitutes about 20% - 30% of the value of the solution to the customer. The other 70% - 80%, and the true driver for customer selection of one solution over another, is the "brain" – the proprietary combination of hardware and software that enables the robotic arm to pick and sort

13

materials for logistics customers. Cognex suspects that Covariant does not even build its own robotic arms, but rather purchases them from one or more vendors that manufacture the necessary robotic parts.

54.     Brown's new role with Covariant overlaps significantly with his former role for Cognex, and places Cognex's Confidential Information and goodwill at direct risk. Among other things, Brown could use the detailed knowledge about Cognex's strategic plan and pipeline in the logistics space to guide Covariant as it competes for business in the market.

55.     Brown also has "negative knowledge" of what has not worked for Cognex as in its years of creating solutions for its customers in the logistics industry. This negative knowledge would be invaluable to a relatively new company like Covariant, allowing it to bypass the costly and time intensive process of trying, and failing, to solve customer problems. Because many applications of machine vision in the logistics industry remain largely unsolved, Covariant would be in a position to unfairly benefit from Cognex's Confidential Information, which could lead to immense "first mover" advantages.

56.     Brown could also use his knowledge of Cognex's limitations to exploit those areas of perceived weakness and attempt to convert Cognex's customers to Covariant's technology. For example, Brown is aware of customer challenges that Cognex has not yet been able to solve. To the extent Covariant's technology could fill these gaps more quickly than Cognex, or provide a substitute for existing Cognex solutions, Brown would be in a position to unfairly utilize Cognex's sensitive information to identify and act upon those competitive advantages.

57.     The Cognex customer goodwill that has attached to Brown, and that he brings with him to Covariant, would also provide an immeasurable advantage to Covariant. For example, for some of Cognex's largest customers, it would be very difficult for Covariant to identify and access

14

receptive buyers to learn about Covariant's machine vision solutions.  Many large customers currently specify that their system integrators use Cognex's offerings as they build out logistics solutions.  Brown is in a position at Covariant to use Cognex's goodwill to try to change or weaken those specifications.

58.     Brown can use his his/Cognex's contacts at Cognex customers – information which constitutes Cognex's Confidential Information – to quickly connect with decision-makers and use Cognex's goodwill to arrange meetings and/or presentations on behalf of Covariant.  He can then use his knowledge of Cognex's market approach, prioritization, and strategic plan to pitch Covariant in a competitive process or as an alternative to a Cognex solution the customer is presently using.

59.     If Brown is permitted to use Cognex's goodwill to divert customer business to, or generate new business for Covariant, the impact on Cognex would be immeasurable.

### COGNEX NOTIFIES BROWN AND COVARIANT OF THE BREACH

60.     On March 21, 2022, immediately upon learning of Brown's new role as Head of Sales at Covariant, Cognex sent a letter to both Brown and Covariant attaching a copy of the Agreement and demanding that he immediately cease and desist violating his ongoing obligations thereunder. Copies of these letters are attached as Exhibit C and Exhibit D.

61.     Cognex provided a deadline of 5:00 p.m. Eastern Time on Friday, March 25, 2022 for Brown to comply with Cognex's cease and desist demand.

62.     Upon information and belief, Brown has already reached out to a certain Cognex customer on behalf of Covariant in order to discuss "a potential opportunity."  The contact information used to connect with the Cognex customer constitutes Cognex's Confidential Information.  In connection with this opportunity, upon information and belief, Brown also

contacted certain current Cognex employees. According to Brown, Covariant's anticipated role in this "opportunity" is to provide a "robotic induct system" for a Cognex customer; this contemplated project is directly competitive with solutions offered by Cognex's technology.

63.     Upon information and belief, Brown will attend the Modex Conference in Atlanta, GA on behalf of Covariant.  Modex is one of the largest logistics conferences in the country and runs from March 28 – 31, 2022.  Brown attended Modex for Cognex many times.  Based on his role as Head of Sales for Covariant, it is anticipated that Brown will use Cognex's goodwill with Cognex's customers to set up meetings on behalf of Covariant, at which he will utilize Cognex's Confidential Information to benefit Covariant.

64.     Late on March 24, 2022, Cognex received a response to the cease and desist letter from counsel for Brown.  In the response, Brown's counsel did not address the substance of Cognex's demand; rather, she requested an extension of time to respond to the demand until Tuesday, April 5, 2022.

65.     Counsel for Cognex responded to the request for an extension of time by indicating that Cognex would be willing to give the requested extension of time, but only if Brown would cease and desist from his ongoing breaches of the Agreement during the extension period. Specifically, as a condition for extending the time for Brown to response to the demand letter until April 5, 2022, Cognex demanded that Brown confirm by 5:00 p.m. MST on March 25, 2022, that he would cease those activities that would cause Cognex irreparable harm, including (1) Brown's cessation of employment with Covariant through April 5, 2022; (2) Brown's cessation of contact with any customer or potential customer of Covariant and the cancellation of any meeting with any Covariant customers through April 5, 2022; (3) Brown's agreement not to contact any Cognex employee, consultant or contractor; (4) a suspension of Brown's access to Covariant's computer

16

and other systems, including email through April 5, 2022; and (5) Brown's agreement not to file any litigation involving Cognex prior to April 6, 2022. Cognex also demanded that, to the extent counsel for Brown does not also represent Cognex, that Covariant agree in writing that it would also abide by the same terms to which Cognex required that Brown agree.

66.     Brown did not agree to Cognex's proposed terms, leaving Cognex with no choice but to file the instant lawsuit to prevent continued irreparable harm.

## COUNT I
### Breach of Contract

67.     Cognex realleges and incorporates herein by reference each and every other paragraph of this Complaint as if set forth herein.

68.     The Non-Competition and Non-Solicitation provisions in the Agreement are required to protect Cognex's Confidential Information.

69.     The Non-Competition and Non-Solicitation Provisions in the Agreement are reasonable in scope of geography and time.

70.     The Agreement is a valid and enforceable agreement under Arizona law.

71.     Brown committed a breach of the Agreement by accepting employment with Covariant during the term of the non-competition provision in the Agreement.

72.     Brown committed a breach of the Agreement by misappropriating and using Cognex's Confidential Information.

73.     Upon information and belief, Brown has committed a breach of the Agreement by soliciting business in violation of the terms of the Agreement.

74.     Brown continues to be in breach of his obligations under the Agreement.

75.     Cognex has suffered harm as a result of Brown's breach of contract.

76.     Pursuant to the terms of the Agreement, in the event that Brown breaches Section 1 or Section 4 of the Agreement, Brown is legally obligated to repay or forfeit all proceeds, gains or other benefits actually or constructively received by Brown from the exercise of stock options or vesting of restricted stock units issued pursuant to the Equity Award Agreements.

## COUNT II
### Request for Declaratory Relief

77.     Cognex realleges and incorporates herein by reference each and every other paragraph of this Complaint as if set forth herein.

78.     There exists a genuine dispute, ripe for adjudication, between the parties as to whether Brown's employment with Covariant is in breach of the terms of the non-competition provision of the Agreement.

79.     All of the parties necessary for a complete and final adjudication of these questions are parties hereto.

80.     Cognex requests that the Court, pursuant to M.G.L. c. 231, § 1, declare that Brown's employment with Covariant is prohibited under the terms of the Agreement.

### Jury Demand

Plaintiff demands a trial by jury on all counts of the Complaint so triable.

## **Prayer for Relief**

Plaintiff respectfully requests that this Honorable Court:

A.      Enter a judgment in favor of Plaintiff on Count I of the Complaint and award Plaintiff actual damages arising from Brown's breaches of contract;

B.      Enter a judgment in favor of Plaintiff on Count II of the Complaint and declare that Brown is bound by the terms of the Agreement and that Brown's employment with Covariant is prohibited under the terms of the Agreement;

C.      Issue a preliminary and permanent injunction prohibiting Defendant Brown from:

  i.   continuing his employment with Covariant in violation of his non-competition obligation;

  ii.  soliciting, or attempting to solicit, recruit or hire any person who is, or was, during the one year period prior to Brown's Separation Date, or is during the eighteen month period following Brown's resignation, an employee, consultant or contractor of Cognex to terminate, alter or modify such person's relationship with Cognex;

  iii. soliciting, accepting from, or performing for any person or entity that was a customer of Cognex as of Brown's Separation Date, and with which Brown had material contact in the two-year period prior to the Separation Date, any business of the type performed or which could be performed by Cognex for such customer;

  iv.  persuading any customer of Cognex as of Brown's Separation Date, with whom Brown had any material contact in the two-year period prior to Brown's Separation Date, to cease doing business with Cognex or to reduce the amount or scope of business that such customer has customarily done with Cognex or is reasonably expected to do with Cognex; or

  v.   using or disclosing Plaintiff's Confidential Information or trade secrets;

D.      Award Plaintiff its attorneys' fees and costs;

E.      Order expedited discovery on this matter; and

F.      Grant such further and other relief as is just, necessary, and proper.

Respectfully submitted,
Plaintiff,
Cognex Corporation,
By its attorneys,

Jennifer A. Yelen BBO# 565205
jennifer.yelen@afslaw.com
Andrew R. Levin BBO# 631338
Andrew.levin@afslaw.com
Lauren C. Schaefer BBO # 696628
lauren.schaefer@afslaw.com
ArentFox Schiff LLP
800 Boylston Street, 32nd Floor
Boston, MA  02199
Telephone: (617) 973-6100
Facsimile: (617) 367-2315

Dated:  March 28, 2022

20

# EXHIBIT A

DocuSign Envelope ID: 21773B70-480D-4607-A76E-12ECD028F0A4

# COGNEX

### EMPLOYEE INVENTION, NON-DISCLOSURE AND NON-COMPETITION AGREEMENT

This AGREEMENT is entered into this 14th day of May, 2021, by and between Cognex Corporation, a Massachusetts corporation with a principal place of business at One Vision Drive, Natick, Massachusetts 01760-2059 and any of its affiliates, subsidiaries, successors and assigns as presently constituted and as may be established in the future (the "Company") and Justin Brown, the undersigned employee of the Company (the "Employee").

IN CONSIDERATION of the promotion of Employee to Senior Vice President, Global Logistics Sales by the Company, in recognition of the fact that the Employee has access to certain trade secrets and/or confidential and proprietary information in conjunction with his or her employment with the Company, in consideration of the wages, equity based awards and other benefits provided to the Employee by the Company during his/her period of employment, and for other good and valuable consideration as specifically set forth below, the receipt and sufficiency of which are hereby acknowledged by the Employee, the Employee hereby agrees as follows:

1. **Non-Competition**

   a. For as long as Employee is employed by the Company, Employee shall devote his/her full time and efforts to the Company and shall not engage, participate or invest, directly or indirectly, in any capacity in any business or activity that is in competition with the Business of the Company.  For the purposes of this Non-Competition Section, "Business of the Company" is defined as the development, marketing, selling or servicing of machine vision systems or bar code readers;

   b. Because of the Company's legitimate business interest as described herein and the good and valuable consideration offered to the Employee, during the term of Employee's employment and for the eighteen (18) month period following the effective date of Employee's separation ("Separation Date"), for any reason, from the Company (the "Non-Competition Period"), Employee shall not, directly or indirectly, engage in any Prohibited Activity within the area where Employee performed services for the Company during the two-year period prior to Employee's Separation Date or for any of the Company's Competitors (as defined in Section 1(c) below), provided, however, that if Employee was employed by the Company for less than one year, the Non-Competition Period shall continue for the greater of six months or the length of Employee's employment; and provided, however, that if the Employee violates the terms of this Section, the Non-Competition Period will begin to run from the first date on which Employee ceases to be in violation of his/her obligations under this Section;

   c. For purposes of this Non-Competition Section, "Prohibited Activity" is (i) activity engaged in by Employee for a Competitor (as defined below) as an employee, employer, owner, operator manager, advisor, consultant, agent, partner, director, stockholder, officer, volunteer, intern or in any other similar capacity, where the activity is similar to that engaged in by the Employee for the Company; (ii) providing services to a Competitor similar to those performed by Employee on behalf of the Company; and (iii) activity by the Employee that may require or inevitably require disclosure of trade secrets, proprietary information or Confidential Information, as defined below.  For the purposes of this Non-Competition Section, a "Competitor" is a person or entity engaged in the Business of the Company or which provides services or products substantially similar to the Business of the Company;

   d. Employee's aggregate ownership as the result of open market purchases of two (2%) percent or less of the capital stock of a Competitor or of an entity engaged in the Business of the Company, the stock of which is regularly traded on a stock exchange or in the over-the-counter market and where the Employee has no involvement in such entity or its business activities other than exercising his or her voting rights as an equity holder, shall not constitute a violation of this provision; and

   e. Employee acknowledges and agrees that this Section 1 "Non-Competition" is reasonable and intended to protect the Company's Confidential Information, relationships with customers, and goodwill.

2. **Confidentiality of Company Confidential Information**

   Employee acknowledges that the development and/or acquisition of Confidential Information by the Company is the result of great effort and expense by the Company, that the Company's Confidential Information is essential to its success, competitiveness and profitability, and that it is critical to the Company's business reputation and success that Confidential Information, as described below, be maintained in strict confidence. Accordingly, Employee agrees that during his/her employment with the Company and thereafter, Employee shall not use for his/her own benefit or for the benefit of any other person or entity, divulge or disclose to anyone except for persons within the Company

DocuSign Envelope ID: 21773B70-480D-4607-A76E-12ECD028F0A4

whose positions require them to know it, any information not already lawfully available to the public concerning the Company or any information constituting a trade secret pursuant to Massachusetts law (collectively, "Confidential Information"). Confidential Information includes, without limitation, any trade secrets, technical data, design, pattern, formula, process, methods, computer program, source code, object code, algorithm, subroutine, manual, product specification, or plan for a new, revised, enhanced, modified or existing product; operational and functional features and limitations of the Company's software or other products; any business, marketing, financial, pricing or other sales-related data; information regarding the present or future business products of the Company; information regarding employees including contact information, employee lists, organizational charts, information concerning particular employee skill sets, technical and business knowledge, and compensation; and any information concerning the particular needs of clients or customers and their buying patterns, price sensitivities, key decision makers (and the contact information for such individuals), product needs, product specifications, request for proposal and the responses thereto. The foregoing shall be deemed "Confidential" regardless of whether tangible or intangible, memorialized electronically, graphically, or in writing, or labeled "Confidential." Nothing in this Section 2 is intended to limit Employee's rights under Section 7 of the National Labor Relations Act.

Without limiting the above provisions, Employee shall immediately notify the Company of the occurrence of (i) the disclosure or use of any Confidential Information in a manner inconsistent with the provisions of this Agreement, or as otherwise not expressly authorized in writing by the Company; (ii) a request by anyone to examine, inspect or copy Confidential Information; or (iii) any attempt to serve, or the service of, a court order, subpoena, or summons upon Employee that purports to require the production or disclosure of any Confidential Information; and Employee shall cooperate with the Company and its Customers and other third parties in an effort to oppose such request, subpoena order or summons.

3. **Confidential Information of Third Parties**

   Employee agrees that, while working for the Company, he or she shall not use or disclose to any employee or representative of the Company any trade secrets or confidential or proprietary information that he or she may have learned while working for a former employer or client or while providing services to any other person or entity. Employee further acknowledges and confirms that he or she has not kept or brought to the Company any documents of any former employer, person or entity to whom Employee provided services that may contain trade secrets or proprietary or confidential information and agrees that Employee shall not use any such trade secrets or proprietary or confidential information in connection with his or her employment with the Company. Employee understands that use of any trade secrets or confidential or proprietary information that he or she may have learned while working for a former employer or while providing services to any other person or entity in connection with his/her employment by the Company shall constitute grounds for termination for Cause.

4. **Non-Solicitation**

   a. During Employee's employment and for the eighteen (18) month period following his/her separation from employment (the "Non-Solicitation Period"), for any reason, from the Company, Employee agrees that he/she will not, either on his/her own behalf or on behalf of any person or entity, directly or indirectly: (i) solicit, or attempt to solicit, recruit or hire, any person who is, or was, during the one year period prior to Employee's Separation Date, or is during the Non-Solicitation Period, an employee, consultant or contractor of the Company, to terminate, alter or modify such person's relationship with the Company; (ii) solicit, accept from, or perform for any person or entity that is a customer of the Company as of the Employee's Separation Date, with which Employee had material contact during the two-year period prior to the Separation Date ("Customer") any business of the type performed or which could be performed by the Company for such Customer; or (iii) persuade any Customer to cease doing business with the Company or to reduce the amount or scope of business that such Customer has customarily done or is reasonably expected to do with the Company. If the Employee violates the terms of this Section, the Non-Solicitation Period will begin to run from the first date on which Employee ceases to be in violation of his/her obligations under this Section; and

   b. Employee acknowledges and agrees that this Section 4 "Non-Solicitation" is reasonable and intended to protect the Company's Confidential Information, established customer relationships and goodwill.

5. **Ownership of Intellectual Property**

   a. All developments are the property of the Company. Except as provided herein, all Confidential Information, copyrights, works of authorship, mask works, trademarks, inventions, discoveries, developments, enhancements, designs, formulae, processes, procedures, methods, ideas and improvements (whether or not patentable), copyrightable works, and all writings, compilations, programs, documentation and reports related thereto (whether or not copyrightable), invented, created, discovered, developed, conceived, devised, prepared or otherwise made

DocuSign Envelope ID: 21773B70-480D-4607-A76E-12ECD028F0A4

by the Employee ("Inventions"), alone or with others, whether or not reduced to tangible form or reduced to practice during the period of Employee's employment with the Company, shall be the sole property of the Company from the moment of their invention, creation, discovery, development, conception, or preparation.  This shall not apply to an invention that Employee develops solely on his/her own time without using Company equipment, supplies, facilities, or Confidential Information except for those Inventions that either (i) relate at the time of conception or reduction to practice of the Invention to the Company's business, or to the actual or demonstrably anticipated research or development of the Company (or, for employees in jurisdictions with a different standard, to the fullest extent permitted by law); or (ii) are suggested by or result from any work performed by Employee for the Company;

b.  Employee agrees to disclose Inventions to the Company fully and in writing promptly after development, conception, invention, or discovery of the same, and at any time upon request, including the disclosure of any Inventions related thereto made, conceived, devised, discovered or prepared by the Employee after the termination of the Employee's employment with the Company which in any way arise from or are based upon any Company Confidential Information or for which the Company possesses a license.  Upon disclosure of an Invention by Employee, he/she agrees to execute a specific written assignment of the Invention to the Company.  The Employee further agrees assist the Company in any reasonable manner necessary to obtain for the Company's benefit patents or copyrights thereon in any and all countries, and to execute when requested patent or copyright applications and assignments thereof to the Company and any other documents deemed necessary by the Company to carry out the purposes of this Agreement, all without further consideration, but at the expense of the Company. The obligations and undertakings stated in this section shall continue beyond Employee's separation from employment with the Company indefinitely regardless of the reason for such separation;

c.  Employee agrees to assign and hereby does assign to the Company all right, title and interest throughout the world in and to all Inventions.  Employee agrees that such Inventions shall constitute "work made for hire" as that term is used in the Copyright Law of the United States and hereby assigns to the Company all copyrights, patents and other proprietary rights Employee may have in any Inventions without any obligation on the part of the Company to pay royalties or any other consideration to Employee in respect of such Inventions;

d.  The Employee hereby grants to the Company a non-exclusive, perpetual, unlimited, irrevocable and fully paid, royalty free license, without additional compensation, of the Employee's rights to any invention, improvement or enhancement made, conceived, devised or discovered by the Employee prior to the Employee's employment by the Company and incorporated by the Employee in any work product produced by the Employee during his or her employment with the Company;

e.  Employee waives any rights he/she may have in any Inventions and, to the extent such waiver is ineffective under applicable law until an Invention is developed, conceived, created, invented or discovered, Employee agrees to waive such rights immediately upon the development, conception, creation, invention or discovery of such Invention;

f.  Employee hereby represents and warrants that (i) each, if any, Invention relating to his or her employment with the Company is original to the Employee; (ii) each such Invention does not and will not infringe upon or violate the copyrights, trademarks, service marks, patents or any other rights whatsoever of any third party; (iii) no third party has any rights in, to or arising out of, or in connection with, each such Invention or the rights granted herein; and (iv) the Company, its assigns and licensees, shall be free from all claims for fees, royalties, or other payments from all persons asserting any rights in, to, arising out of, or in connection with each such Invention or any rights therein; and

g.  Employee agrees that during and after his/her employment he/she will provide all assistance that the Company reasonably requests (without charge, but at no cost to Employee), to secure or enforce its rights throughout the world with respect to Inventions, including signing all necessary documents to secure or memorialize those rights. If Employee fails or refuses to sign documents necessary to secure or enforce the Company's rights, or if the Company cannot locate the Employee through the exercise of reasonable diligence, Employee irrevocably appoints the Company or its designee as Employee's attorney to sign such documents in Employee's name.

## 6.  **Employee's Representation and Warranties**

The Employee hereby represents and warrants to the Company that:

a.  Prior to his or her employment by the Company, he or she had no detailed knowledge of, experience with, or training in the specification, design, manufacture or marketing of machine vision systems other than as may be described in writing and attached hereto as Exhibit 1; and

DocuSign Envelope ID: 21773B70-480D-4607-A76E-12ECD028F0A4

b. He or she is not a party to or in any way bound by any prior agreement whether with a prior employer or otherwise, which could in any way prohibit him or her from becoming an employee of the Company or from carrying out his or her obligations under this Agreement; and he or she acknowledges that he or she will be solely responsible for any costs and damages resulting from any violation of any such agreement and shall indemnify the Company from same.

7. **Remedy for Breach/Relief**

   a. To the fullest extent permitted by law, consistent with the terms of the Cognex Corporation 2001 General Stock Option Plan (where applicable), the Cognex Corporation 2007 Stock Option and Incentive Plan, and related equity award agreements (collectively, the "Equity Award Agreements"), and in addition to all other rights and remedies available to Cognex at law or in equity, in the event Employee breaches Section 1 (Non-Competition) or Section 4 (Non-Solicitation) of this Agreement, Employee agrees to repay or forfeit all proceeds, gains or other benefits actually or constructively received by the Employee from the exercise of stock options or vesting of restricted stock units issued pursuant to the Equity Award Agreements.

   b. The Employee expressly recognizes and agrees that the terms of this Agreement are reasonable and required to protect the legitimate business interests of the Company, that any breach of this Agreement by the Employee will result in immediate and irreparable harm to the Company not compensable by monetary damages, and that the Company shall be entitled to obtain injunctive relief in addition to all other relief in any court of competent jurisdiction, to enforce the terms of this Agreement, without having to prove or show any actual damages to the Company, and without the necessity of posting any bond or other security.

8. **Return of Property**

   At the Company's request, or upon termination of Employee's employment, whichever occurs first, Employee shall (a) immediately deliver to the Company all documents or media containing Confidential Information, any work product, or any copies or records thereof, or other Company information stored in any form or format whatsoever, (b) permanently erase all of the Confidential Information from any personal computer systems or devices, and (c) certify in writing that Employee has complied with the requirements of this Section.  Employee also agrees to sign an acknowledgment of his/her obligations under this Agreement.

9. **Miscellaneous**

   a. Employee acknowledges (i) he/she was advised of Employee's right to consult with an attorney prior to signing this Agreement , (ii) that he/she has read, carefully considered, and understands this Agreement, (iii) that the Employee will retain Confidential Information of the Company by virtue of the Employee's employment; (iv) that the terms of this Agreement are fair and reasonable, required in order to protect and maintain the legitimate business interests of the Company, and were fully bargained for in good faith prior to commencing employment with the Company or during the period of Employee's employment in exchange for valuable consideration, (v) that he/she executes this Agreement voluntarily, and (vi) that this Agreement is not the product of fraud, duress or coercion.  Employee acknowledges that the terms of this Agreement, including those covenants in Section 1, do not constitute any impairment of the Employee's ability to pursue a livelihood during the Non-Competition Period.  To the extent that the terms and conditions of this Agreement, including those covenants in Section 1, are deemed to constitute an impairment of the Employee's ability to work within his or her field of expertise during the Non-Competition Period, the Employee hereby agrees that this Agreement provides fair consideration for such impairment and that the potential harm to the Company of the non-enforcement of these provisions outweighs any harm to employee caused by the enforcement of the restrictions by injunction or otherwise;

   b. The Employee further acknowledges that the amount of his/her compensation reflects, in part, his/her obligations and the Company's rights under this Agreement; that the Employee has no expectation of any additional compensation, royalties or other payment of any kind not otherwise referenced herein in connection herewith; and that the Employee will not be subject to undue hardship by reason of his/her full compliance with the terms and conditions of this Agreement or the Company's enforcement thereof;

   c. This Agreement contains the entire understanding and agreement between the parties hereto with respect to the matters referred to in this Agreement.  This Agreement may be altered, amended or superseded only by an agreement in writing, signed by the parties or the party against whom enforcement of any waiver, change, modification, extension or discharge is sought.  No failure by the Company to insist on strict compliance with any of the terms herein, and no delay or omission by the Company in exercising any right under this Agreement will operate as a waiver of such terms.  A written waiver or consent given by the Company on any one

DocuSign Envelope ID: 21773B70-480D-4607-A76E-12ECD028F0A4

occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion;

d.   The provisions of this Agreement are severable and, in the event that any court of competent jurisdiction shall determine that any provision or covenant herein contained is invalid, or overly broad or unreasonable under applicable law, in whole or in part, the parties request that the court revise said provision or covenant so as to provide the maximum benefit allowed by law to the Company, and that the remaining provisions or covenants remain unchanged and enforceable.  In the event that the court determines that Section 1 of this Agreement would be enforceable except for reason of lack of adequate consideration herein, then the court is further hereby requested to determine such additional consideration such that, if paid by the Company to the Employee, the court would find Section 1 binding and enforceable upon the Employee.  The Company shall then have the sole right to pay such additional consideration to the Employee, and failing such payment, the Company shall then abide by the court's determination;

e.   This Agreement shall be binding upon the Employee, without regard to the duration of his or her employment by the Company or the reasons for the termination of such employment, which termination may be voluntary or involuntary, and which may be with or without cause.  Nothing stated in this Agreement shall in any way alter or modify the Employee's "at will" employment status with the Company.  This Agreement shall also be binding upon the Employee's administrators, executors, personal representatives, heirs, and assigns, and shall inure to the benefit of the Company, its successors and assigns;

f.   One original signed copy of this Agreement shall be executed and maintained on file by the Company.  The Employee shall receive a copy of the signed original which shall be considered to have the force and effect of the original;

g.   All issues concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by, construed and enforced in accordance with the laws of the State in which Employee has his or her primary residence at the time of signing this Agreement, without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any other jurisdiction;

h.   Defend Trade Secrets Act of 2016.  Employee acknowledges receipt of the following notice under 18 U.S.C § 1833(b)(1): "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal;" and

i.   This Agreement shall be deemed effective as of the first date of employment of the Employee by the Company.  In the event this Agreement is executed by the Employee on a date following the first date of employment of the Employee by the Company, the Agreement shall be deemed effective as of the date executed by the Employee.

The above is hereby agreed and accepted effective as of the date first written above.

Employee:      *Justin Brown*
               (Employee Signature)

               Justin Brown
               (Printed Name)

Cognex Corporation:

By:  *Sheila M. DiPalma*
     (Authorized Company Signature)

Address:      37310 N 104th Place Scottsdale, AZ 85262

              Senior Vice President of Sales

DocuSign Envelope ID: 21773B70-480D-4607-A76E-12ECD028F0A4

## Exhibit 1

<u>Description of the Employee's prior detailed knowledge of, experience with, or training in the specification, design, manufacture or marketing of machine vision systems:</u>

[Please see Exhibit 1 from previously executed non-compete]

The information set forth in this Exhibit 1 is agreed to and understood by:

Employee: _____JB_____          Company: _____SMD_____
       (Please initial)                        (Please initial)

**DocuSign**

## Certificate Of Completion

Envelope Id: 21773B70480D4607A76E12ECD028F0A4
Subject: Please DocuSign: Employee Invention Non-Disclosure and Non-Compete Agreement
Source Envelope:
Document Pages: 6
Certificate Pages: 5
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-05:00) Eastern Time (US & Canada)

Signatures: 2
Initials: 2

Status: Completed

Envelope Originator:
Leah Levy
1 Vision Dr.
Natick, MA  01760
leah.levy@cognex.com
IP Address: 108.20.205.76

### Record Tracking

Status: Original
    May 14, 2021 | 14:30

Holder: Leah Levy
    leah.levy@cognex.com

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| Justin Brown<br>Justin.Brown@cognex.com<br>VP of Sales<br>Cognex Corporation<br>Security Level: Email, Account Authentication<br>(None) | *Justin Brown*<br>—2A5469D8C8BE4FD...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 198.232.30.232 | Sent: May 14, 2021 \| 14:33<br>Viewed: May 14, 2021 \| 16:06<br>Signed: May 17, 2021 \| 15:44 |

Electronic Record and Signature Disclosure:
    Accepted: Jan 23, 2019 | 18:14
    ID: c89bdfe8-14c6-4a06-bbd5-91723004121a

| | | |
|---|---|---|
| Sheila M. DiPalma<br>sheila.dipalma@cognex.com<br>EVP Employee Services<br>Security Level: Email, Account Authentication<br>(None) | *Sheila M. DiPalma*<br>—380AC11A50A6466...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 198.232.30.235 | Sent: May 17, 2021 \| 15:44<br>Viewed: May 17, 2021 \| 16:40<br>Signed: May 17, 2021 \| 16:40 |

Electronic Record and Signature Disclosure:
    Accepted: Mar 25, 2019 | 07:47
    ID: 0f068252-b818-4e4e-87d7-df82fcf244f9

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | May 14, 2021 \| 14:33 |
| Certified Delivered | Security Checked | May 17, 2021 \| 16:40 |

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Signing Complete | Security Checked | May 17, 2021 | 16:40 |
| Completed | Security Checked | May 17, 2021 | 16:40 |

| Payment Events | Status | Timestamps |
|---|---|---|

| Electronic Record and Signature Disclosure | | |
|---|---|---|

Electronic Record and Signature Disclosure created on: Jan 23, 2019 | 11:09
Parties agreed to: Justin Brown, Sheila M. DiPalma

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Cognex Corporation (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Cognex Corporation:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: privacy@cognex.com

**To advise Cognex Corporation of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at leah.levy@cognex.com and in the body of such request you must state: your previous email address, your new email address.  We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Cognex Corporation**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to leah.levy@cognex.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Cognex Corporation**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to privacy@cognex.com and in the body of such request you must state your email, full name, mailing address, and telephone number. Name, email address.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Cognex Corporation as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Cognex Corporation during the course of your relationship with Cognex Corporation.

# EXHIBIT B

# VERDICT

BUSINESS ＞ AI AND AUTOMATION   December 2, 2021

## Covariant CEO on the company's unicorn sauce: A computer vision AI brain that really works

By Giacomo Lee



Covariant CEO Peter Chen



Forget humanoid robots or dancing mechanical dogs. If you want a real technological challenge, try making an AI brain which can sort items in a retail warehouse or an automotive factory, or any other industrial setting for that matter.

Covariant is one brand which has taken on this challenge – and with some success. Having raised $147m in funding so far with total valuation undisclosed, the Berkeley-based startup is one of GlobalData's AI unicorns predicted to go public next year with a valuation of $1bn+, and the only name on that hot list dealing with the burgeoning theme of smart robotics.

That's all down to the company's signature off-the-shelf universal AI for robots, known as the Covariant Brain. As CEO Peter Chen tells *Verdict*, the product has the potential to transform operation in retail and other sectors, while demonstrating the potential of AI-powered robots in disrupting industries and creating the factory of the future.

Even more intriguingly, *Verdict* learns these robots can "see" transparent objects, which may give pause to those sceptical as to whether a robot can truly replace a human in the industrial workplace.

## Deep tech which can "see" anything

"Covariant's AI-powered robotics solutions in particular are designed to see, learn, and interact with the world around them so they can handle complex and ever-changing operations in a warehouse setting," Chen explains when asked about the AI brain powering Covariant's robotic arms. "That means they can autonomously handle, whether it's pick, pack or ship, millions of different types of items that can exist in a modern warehouse."

The software involved relies on what Chen calls various "breakthrough" AI technologies, primarily in deep reinforcement learning, or deep RL.

A type of machine learning, deep RL sees neural networks learning from experience, or reinforcement learning, rather than as usual from historical data. Such networks are "deep" in that they have more layers of "neural" gates, making them more like the human brain than conventional computing architecture.

"Deep RL is one of the core technologies that we pioneered in academic research, continued to advance as part of research at Covariant and commercialized into the Covariant Brain," says Chen.

"We believe deep RL is a critical piece of the puzzle to build capable AI systems for robotics because it fundamentally gives AI the ability to make decisions as opposed to just understanding."

The final product, as Chen explains, is a robotic arm that "sees" what it picks, packs and ships from moving lines and shelves. This is through the AI tech of computer vision, where deep RL software meets old-fashioned camera hardware.

This proprietary vision system combines cameras and software to provide perception capabilities to robots. With AI at the core of the system, this allows the Covariant Brain to distinctly 'see' a wide variety of objects regardless of the packaging type: transparent, poly-wrapped, overlapping, deformed, partially obscured, reflective and more.

The tech can also see "the orientation of the scene – packed chaotically, objects placed in divided bins, distributed in obscured positions, stacked on top of each other," Chen adds, "so it understands where to grasp".

lidar is involved, but Chen finds the comparison between computer vision and lidar to be an interesting one.

"While lidar has a lot of successes in the self-driving car industry, we have found its use in AI robotics, in particular in logistics, to be limited. For example, it's typically challenging for lidar systems to perceive transparent or reflective objects in a robust way."

As Chen explains, transparent objects present challenges for robots both in "knowing where they are" and in "understanding how to best handle them".

"AI vision systems in a warehouse setting look for patterns to help distinguish objects and determine how to pick them. This becomes challenging when differences are difficult to distinguish or when it's unclear where to grasp the object.

"That's often where other providers fail. Characteristics like size, packaging type, color, and shape all influence how challenging an object is to pick.

"One of our main customers is a 3PL (third-party logistics) for primarily Health and Beauty companies," says Chen, citing an example. "As you can imagine, products in this area are usually encased in transparent reflective packaging and also small – that's quite the picking challenge.

"And that's one part of our secret sauce – our system's ability to see and immediately understand how to pick up these items accurately and quickly, even if it's never seen that specific product before."

## From UC to ABB

The deep tech behind Covariant's secret sauce stems back to Chen's academic research with company co-founders Rocky Duan, Tianhao Zhang and Pieter Abbeel. The foursome met in 2016 while conducting AI research at UC Berkeley's Artificial Intelligence Lab and at OpenAI, the non-profit whose founders include Tesla CEO Elon Musk. Musk is well known to favour computer vision over lidar for his cars' self-driving capability.

A year later the researchers decided to take their work into the commercial market with the founding of Embodied Intelligence, later to be renamed as Covariant.

"After coming from Berkeley and OpenAI, I've had the experience of being in a purely research-based setting," says Chen when asked about the switch from researcher to CEO. "At Covariant – which is a bit of both because our team is always conducting R&D in our corporate lab that keeps us at the forefront of AI robotics – I enjoy a combination.

"Making breakthroughs is exciting on its own and then witnessing the value that they can bring to customers starting Day 1 is satisfying as well. I love building intelligent robots but I also want them to be practical."

That practicality has seen Covariant grow from university labs into one of the world's top AI unicorns. Its most recent Series C funding was, according to GlobalData's deals database, to the tune of $80m, and the company has already established a partnership with robotics giant ABB for an undisclosed amount.

The ABB relationship makes sense as more of the robotics old-guard cotton onto the power of AI in future factories. AI technologies, most notably machine learning such as deep RL, are integral to the development of intelligent industrial robots, which can anticipate and adapt to certain situations based on the interpretation of data derived from an array of sensors.

## AI brain box

But Covariant isn't simply looking to form cogs in an established industry. With its off-the-shelf AI brain, the company's vision is to bring smart robotics into any kind of industrial setting without the need for installation or adaptation of the existing software: whether for apparel, healthcare or food operations.

"These deep neural networks are designed to be universal so when they encounter a new task, they don't need to be re-trained to have strong out-of-the-box performance," Chen says.

"The Covariant Brain is powering a wide range of industrial robots to manage order picking, putwall, sorter induction – all for companies in various industries with drastically different types of products to manipulate.

"(This) demonstrates the Covariant Brain can help robots of different types to manipulate new objects they've never seen before in environments where they've never operated."

Clients already include retail logistics giants KNAPP and Invata, who, like ABB, may already be savvy to smart robotics. But there are also customers such as electrical supply wholesaler Obeta and the Belgian Post Group (Bpost), the kind of customers which perhaps need the harder sell on cryptic concepts such as deep RL and neural networks.

What then, *Verdict* asks, is the Covariant elevator pitch on its relatively high-concept AI brain?

"What really matters is, 'Are we going to help them run their business better?'" says Chen. "Our main focus is the logistics sector right now and we start by discussing the business challenges specific to them – most often, labour shortage and supply chain fragility.

"AI robotics offers a reliable, financially viable solution that helps warehouses alleviate the pains of labour shortage and in general run more efficiently.

"Generally speaking, our customers – and the broader population – still have a fairly nascent understanding of AI, let alone the different types and methodologies. Our clients that are most successful know enough about AI to identify key performance metrics to do a rigorous evaluation of the different vendor options.

"Having said that, at the end of the day, what our customers care about is that our (products) actually work when deployed in their warehouses and help them increase efficiency."

## From OpenAI to IPO?

This, says Chen, is the reason Covariant continues to see increasing adoption and growth among its customers. ...d has also played its part in the Covariant success story, influencing demand for its technology. But even

without a pandemic, it's likely Covariant would still be a unicorn to keep tabs on in the 2020s, simply because of the potential of its product.

"Autonomous order picking has long been seen as the holy grail for warehouse automation in the robotics world. It's a very hard problem, but thanks to our team's fundamental advances in research and engineering, we've achieved production-grade autonomy for a range of industries over the past year.

"Modern AI is opening up a whole new generation of robotic applications and we're positioned well to capitalize on the heightened market demand."

This is why analytics firm GlobalData is predicting Covariant to go public by 2023. *Verdict* presses the CEO for his future vision as opposed to computer vision, asking whether this forecast is either overly optimistic or overly cautious.

"Haha, I can't say," Chen replies. "We're focused on taking care of our customers and ramping up to meet the increasing interest from prospects.

"We're passionate about bringing AI robotics to every sector. We believe there's an opportunity for Covariant in so many spaces but fitting the technology to the use case is critical. We're starting with logistics and being very intentional about our progress as we plan our future and where our software can keep learning from prior scenarios."

*Find out more in the GlobalData report, Tech Unicorns: Top 10 Themes in 2021.*

**Giacomo Lee**

**More from this author**                                                                SEE ALL

GIACOMO LEE
**Google sues South Korea regulators in Android anti-trust wrangle**

GIACOMO LEE
**Ocado shares fall as robot uprising fails in ROI terms**

GIACOMO LEE
**SoftBank to take Arm public as Nvidia deal finally collapses**

of this topic

3/27/22, 7:50 PM                                    Covariant CEO: Our computer vision AI brain actually works



COMMENT

**How AI could de-escalate online conflict**

---



ANALYSIS

**Verdict Magazine Issue 13: Ukraine's impact on the tech community**

---



ANALYSIS

**How the Great Resignation made tech recruitment even more challenging**

**Verdict**

About us    Contact us    Editorial approach    Our marketing solutions    The Verdict network

**Social**

f    y    in

**Legal**

Privacy policy    Terms and conditions

**Decrypting the latest technology news**
© COPYRIGHT 2022, ALL RIGHTS RESERVED

Powered by 

# EXHIBIT C



# COGNEX

*VIA OVERNIGHT MAIL*

March 21, 2022

Justin Brown
37310 N 104th Place
Scottsdale, AZ 85262

**RE: IMMEDIATE CEASE AND DESIST DEMAND**

Justin:

It has come to our attention that you have accepted employment with Covariant, Inc. ("Covariant"), a direct competitor of Cognex Corporation ("Cognex"). On May 14, 2021, you signed an Employee Invention, Non-Disclosure and Non-Competition Agreement (the "Employee Agreement"), a copy of which is enclosed with this letter for your reference. The Employee Agreement contains explicit non-disclosure, non-competition and non-solicitation provisions that survived the termination of your employment with Cognex. Your prior agreements with Cognex, dated May 23, 2010 and October 24, 2015, contained similar provisions.

**We write to remind you of your obligations under the Employee Agreement and to demand your immediate separation from Covariant in compliance with these obligations.**

As the Employee Agreement makes clear, Cognex has a protectable interest in prohibiting you from performing competitive services for a direct competitor. This interest arises from your past work with Cognex, the goodwill you developed on Cognex's behalf and your knowledge of Cognex trade secrets. During your employment with Cognex, you had direct access to, became knowledgeable of, and utilized highly-sensitive confidential and proprietary information related to Cognex's business. All such information and trade secrets are protectable under your Employee Agreement as well as under state and federal laws.

*Violation of Non-Compete Obligations*

In Section 1 of the Employee Agreement, you agreed not to engage as an employee in any business competitive with Cognex's business. Section 1 states:

> *"Business of the Company"* is defined as the development, marketing, selling or servicing of machine vision systems or bar code readers;

> *[D]uring the term of Employee's employment and <u>for the eighteen (18) month period following the effective date of Employee's separation</u> ("Separation Date"), for any reason, from the Company (the "Non-Competition Period"), <u>Employee shall not, directly or indirectly, engage in any Prohibited Activity</u> within the area where Employee performed services for the Company during the two-year period prior to Employee's Separation Date or for any of the Company's Competitors (as defined in Section 1(c) below)… and provided, however, that if the Employee violates the terms of this Section, the Non-Competition Period will begin to run from the first date on which Employee ceases to be in violation of his/her obligations under this Section;…*

> *"Prohibited Activity"* is (i) activity engaged in by Employee for a Competitor (as defined below) as an employee, employer, owner, operator manager, advisor, consultant, agent, partner, director, stockholder, officer, volunteer, intern or in any other similar capacity, where the activity is similar to

# COGNEX

*that engaged in by the Employee for the Company; (ii) providing services to a Competitor similar to those performed by Employee on behalf of the Company; and (iii) activity by the Employee that may require or inevitably require disclosure of trade secrets, proprietary information or Confidential Information, as defined below. For the purposes of this Non-Competition Section, a "Competitor" is a person or entity engaged in the Business of the Company or which provides services or products substantially similar to the Business of the Company;*

As part of the exit interview on February 25, 2022, you acknowledged and confirmed the existence of the Employee Agreement and your obligations thereunder.

**Based on the foregoing, we demand that you immediately cease and desist from all breaches of the Employee Agreement, including your new employment with Covariant.**

In addition to your obligations to Cognex, Covariant also has a legal obligation not to interfere with the Employee Agreement or with Cognex's existing business relationships. We will be reaching out to Covariant separately to advise them of your Employee Agreement and remind them of the potential liability that they face should they continue to employ you.

Please confirm your receipt of this notice and your intent to fully comply with the terms of your Employee Agreement. Specifically:

1. Immediately terminate your employment with Covariant, and provide Cognex with a copy of your employment separation documents;
2. Immediately cease to provide any form of service to Covariant; and
3. Cease and desist from using or disclosing Cognex's trade secrets and/or confidential information.

If we have not received your written confirmation of compliance with the above by 5:00pm Eastern Time on March 25, 2022, Cognex will, without further notice, take all such actions as it deems necessary in its sole discretion to protect its interests, including pursuing all available remedies at law.

We look forward to your prompt and complete cooperation on this matter.

Sincerely,

Sheila M. DiPalma
Executive Vice President, Employee Services

Encl.

DocuSign Envelope ID: 21773B70-480D-4607-A76E-12ECD028F0A4

# COGNEX

### EMPLOYEE INVENTION, NON-DISCLOSURE AND NON-COMPETITION AGREEMENT

This AGREEMENT is entered into this 14th day of May, 2021, by and between Cognex Corporation, a Massachusetts corporation with a principal place of business at One Vision Drive, Natick, Massachusetts 01760-2059 and any of its affiliates, subsidiaries, successors and assigns as presently constituted and as may be established in the future (the "Company") and Justin Brown, the undersigned employee of the Company (the "Employee").

IN CONSIDERATION of the promotion of Employee to Senior Vice President, Global Logistics Sales by the Company, in recognition of the fact that the Employee has access to certain trade secrets and/or confidential and proprietary information in conjunction with his or her employment with the Company, in consideration of the wages, equity based awards and other benefits provided to the Employee by the Company during his/her period of employment, and for other good and valuable consideration as specifically set forth below, the receipt and sufficiency of which are hereby acknowledged by the Employee, the Employee hereby agrees as follows:

1. **Non-Competition**

   a. For as long as Employee is employed by the Company, Employee shall devote his/her full time and efforts to the Company and shall not engage, participate or invest, directly or indirectly, in any capacity in any business or activity that is in competition with the Business of the Company.  For the purposes of this Non-Competition Section, "Business of the Company" is defined as the development, marketing, selling or servicing of machine vision systems or bar code readers;

   b. Because of the Company's legitimate business interest as described herein and the good and valuable consideration offered to the Employee, during the term of Employee's employment and for the eighteen (18) month period following the effective date of Employee's separation ("Separation Date"), for any reason, from the Company (the "Non-Competition Period"), Employee shall not, directly or indirectly, engage in any Prohibited Activity within the area where Employee performed services for the Company during the two-year period prior to Employee's Separation Date or for any of the Company's Competitors (as defined in Section 1(c) below), provided, however, that if Employee was employed by the Company for less than one year, the Non-Competition Period shall continue for the greater of six months or the length of Employee's employment; and provided, however, that if the Employee violates the terms of this Section, the Non-Competition Period will begin to run from the first date on which Employee ceases to be in violation of his/her obligations under this Section;

   c. For purposes of this Non-Competition Section, "Prohibited Activity" is (i) activity engaged in by Employee for a Competitor (as defined below) as an employee, employer, owner, operator manager, advisor, consultant, agent, partner, director, stockholder, officer, volunteer, intern or in any other similar capacity, where the activity is similar to that engaged in by the Employee for the Company; (ii) providing services to a Competitor similar to those performed by Employee on behalf of the Company; and (iii) activity by the Employee that may require or inevitably require disclosure of trade secrets, proprietary information or Confidential Information, as defined below.  For the purposes of this Non-Competition Section, a "Competitor" is a person or entity engaged in the Business of the Company or which provides services or products substantially similar to the Business of the Company;

   d. Employee's aggregate ownership as the result of open market purchases of two (2%) percent or less of the capital stock of a Competitor or of an entity engaged in the Business of the Company, the stock of which is regularly traded on a stock exchange or in the over-the-counter market and where the Employee has no involvement in such entity or its business activities other than exercising his or her voting rights as an equity holder, shall not constitute a violation of this provision; and

   e. Employee acknowledges and agrees that this Section 1 "Non-Competition" is reasonable and intended to protect the Company's Confidential Information, relationships with customers, and goodwill.

2. **Confidentiality of Company Confidential Information**

   Employee acknowledges that the development and/or acquisition of Confidential Information by the Company is the result of great effort and expense by the Company, that the Company's Confidential Information is essential to its success, competitiveness and profitability, and that it is critical to the Company's business reputation and success that Confidential Information, as described below, be maintained in strict confidence.  Accordingly, Employee agrees that during his/her employment with the Company and thereafter, Employee shall not use for his/her own benefit or for the benefit of any other person or entity, divulge or disclose to anyone except for persons within the Company

DocuSign Envelope ID: 21773B70-480D-4607-A76E-12ECD028F0A4

whose positions require them to know it, any information not already lawfully available to the public concerning the Company or any information constituting a trade secret pursuant to Massachusetts law (collectively, "Confidential Information"). Confidential Information includes, without limitation, any trade secrets, technical data, design, pattern, formula, process, methods, computer program, source code, object code, algorithm, subroutine, manual, product specification, or plan for a new, revised, enhanced, modified or existing product; operational and functional features and limitations of the Company's software or other products; any business, marketing, financial, pricing or other sales-related data; information regarding the present or future business products of the Company; information regarding employees including contact information, employee lists, organizational charts, information concerning particular employee skill sets, technical and business knowledge, and compensation; and any information concerning the particular needs of clients or customers and their buying patterns, price sensitivities, key decision makers (and the contact information for such individuals), product needs, product specifications, request for proposal and the responses thereto. The foregoing shall be deemed "Confidential" regardless of whether tangible or intangible, memorialized electronically, graphically, or in writing, or labeled "Confidential". Nothing in this Section 2 is intended to limit Employee's rights under Section 7 of the National Labor Relations Act.

Without limiting the above provisions, Employee shall immediately notify the Company of the occurrence of (i) the disclosure or use of any Confidential Information in a manner inconsistent with the provisions of this Agreement, or as otherwise not expressly authorized in writing by the Company; (ii) a request by anyone to examine, inspect or copy Confidential Information; or (iii) any attempt to serve, or the service of, a court order, subpoena, or summons upon Employee that purports to require the production or disclosure of any Confidential Information; and Employee shall cooperate with the Company and its Customers and other third parties in an effort to oppose such request, subpoena order or summons.

## 3.  Confidential Information of Third Parties

Employee agrees that, while working for the Company, he or she shall not use or disclose to any employee or representative of the Company any trade secrets or confidential or proprietary information that he or she may have learned while working for a former employer or client or while providing services to any other person or entity. Employee further acknowledges and confirms that he or she has not kept or brought to the Company any documents of any former employer, person or entity to whom Employee provided services that may contain trade secrets or proprietary or confidential information and agrees that Employee shall not use any such trade secrets or proprietary or confidential information in connection with his or her employment with the Company. Employee understands that use of any trade secrets or confidential or proprietary information that he or she may have learned while working for a former employer or while providing services to any other person or entity in connection with his/her employment by the Company shall constitute grounds for termination for Cause.

## 4.  Non-Solicitation

a.  During Employee's employment and for the eighteen (18) month period following his/her separation from employment (the "Non-Solicitation Period"), for any reason, from the Company, Employee agrees that he/she will not, either on his/her own behalf or on behalf of any person or entity, directly or indirectly: (i) solicit, or attempt to solicit, recruit or hire, any person who is, or was, during the one year period prior to Employee's Separation Date, or is during the Non-Solicitation Period, an employee, consultant or contractor of the Company, to terminate, alter or modify such person's relationship with the Company; (ii) solicit, accept from, or perform for any person or entity that is a customer of the Company as of the Employee's Separation Date, with which Employee had material contact during the two-year period prior to the Separation Date ("Customer") any business of the type performed or which could be performed by the Company for such Customer; or (iii) persuade any Customer to cease doing business with the Company or to reduce the amount or scope of business that such Customer has customarily done or is reasonably expected to do with the Company. If the Employee violates the terms of this Section, the Non-Solicitation Period will begin to run from the first date on which Employee ceases to be in violation of his/her obligations under this Section; and

b.  Employee acknowledges and agrees that this Section 4 "Non-Solicitation" is reasonable and intended to protect the Company's Confidential Information, established customer relationships and goodwill.

## 5.  Ownership of Intellectual Property

a.  All developments are the property of the Company.  Except as provided herein, all Confidential Information, copyrights, works of authorship, mask works, trademarks, inventions, discoveries, developments, enhancements, designs, formulae, processes, procedures, methods, ideas and improvements (whether or not patentable), copyrightable works, and all writings, compilations, programs, documentation and reports related thereto (whether or not copyrightable), invented, created, discovered, developed, conceived, devised, prepared or otherwise made

DocuSign Envelope ID: 21773B70-480D-4607-A76E-12ECD028F0A4

by the Employee ("Inventions"), alone or with others, whether or not reduced to tangible form or reduced to practice during the period of Employee's employment with the Company, shall be the sole property of the Company from the moment of their invention, creation, discovery, development, conception, or preparation. This shall not apply to an invention that Employee develops solely on his/her own time without using Company equipment, supplies, facilities, or Confidential Information except for those Inventions that either (i) relate at the time of conception or reduction to practice of the Invention to the Company's business, or to the actual or demonstrably anticipated research or development of the Company (or, for employees in jurisdictions with a different standard, to the fullest extent permitted by law); or (ii) are suggested by or result from any work performed by Employee for the Company;

b.   Employee agrees to disclose Inventions to the Company fully and in writing promptly after development, conception, invention, or discovery of the same, and at any time upon request, including the disclosure of any Inventions related thereto made, conceived, devised, discovered or prepared by the Employee after the termination of the Employee's employment with the Company which in any way arise from or are based upon any Company Confidential Information or for which the Company possesses a license. Upon disclosure of an Invention by Employee, he/she agrees to execute a specific written assignment of the Invention to the Company. The Employee further agrees assist the Company in any reasonable manner necessary to obtain for the Company's benefit patents or copyrights thereon in any and all countries, and to execute when requested patent or copyright applications and assignments thereof to the Company and any other documents deemed necessary by the Company to carry out the purposes of this Agreement, all without further consideration, but at the expense of the Company. The obligations and undertakings stated in this section shall continue beyond Employee's separation from employment with the Company indefinitely regardless of the reason for such separation;

c.   Employee agrees to assign and hereby does assign to the Company all right, title and interest throughout the world in and to all Inventions. Employee agrees that such Inventions shall constitute "work made for hire" as that term is used in the Copyright Law of the United States and hereby assigns to the Company all copyrights, patents and other proprietary rights Employee may have in any Inventions without any obligation on the part of the Company to pay royalties or any other consideration to Employee in respect of such Inventions;

d.   The Employee hereby grants to the Company a non-exclusive, perpetual, unlimited, irrevocable and fully paid, royalty free license, without additional compensation, of the Employee's rights to any invention, improvement or enhancement made, conceived, devised or discovered by the Employee prior to the Employee's employment by the Company and incorporated by the Employee in any work product produced by the Employee during his or her employment with the Company;

e.   Employee waives any rights he/she may have in any Inventions and, to the extent such waiver is ineffective under applicable law until an Invention is developed, conceived, created, invented or discovered, Employee agrees to waive such rights immediately upon the development, conception, creation, invention or discovery of such Invention;

f.   Employee hereby represents and warrants that (i) each, if any, Invention relating to his or her employment with the Company is original to the Employee; (ii) each such Invention does not and will not infringe upon or violate the copyrights, trademarks, service marks, patents or any other rights whatsoever of any third party; (iii) no third party has any rights in, to or arising out of, or in connection with, each such Invention or the rights granted herein; and (iv) the Company, its assigns and licensees, shall be free from all claims for fees, royalties, or other payments from all persons asserting any rights in, to, arising out of, or in connection with each such Invention or any rights therein; and

g.   Employee agrees that during and after his/her employment he/she will provide all assistance that the Company reasonably requests (without charge, but at no cost to Employee), to secure or enforce its rights throughout the world with respect to Inventions, including signing all necessary documents to secure or memorialize those rights. If Employee fails or refuses to sign documents necessary to secure or enforce the Company's rights, or if the Company cannot locate the Employee through the exercise of reasonable diligence, Employee irrevocably appoints the Company or its designee as Employee's attorney to sign such documents in Employee's name.

## 6.   Employee's Representation and Warranties

The Employee hereby represents and warrants to the Company that:

a.   Prior to his or her employment by the Company, he or she had no detailed knowledge of, experience with, or training in the specification, design, manufacture or marketing of machine vision systems other than as may be described in writing and attached hereto as Exhibit 1; and

DocuSign Envelope ID: 21773B70-480D-4607-A76E-12ECD028F0A4

b.  He or she is not a party to or in any way bound by any prior agreement whether with a prior employer or otherwise, which could in any way prohibit him or her from becoming an employee of the Company or from carrying out his or her obligations under this Agreement; and he or she acknowledges that he or she will be solely responsible for any costs and damages resulting from any violation of any such agreement and shall indemnify the Company from same.

7.  **Remedy for Breach/Relief**

a.  To the fullest extent permitted by law, consistent with the terms of the Cognex Corporation 2001 General Stock Option Plan (where applicable), the Cognex Corporation 2007 Stock Option and Incentive Plan, and related equity award agreements (collectively, the "Equity Award Agreements"), and in addition to all other rights and remedies available to Cognex at law or in equity, in the event Employee breaches Section 1 (Non-Competition) or Section 4 (Non-Solicitation) of this Agreement, Employee agrees to repay or forfeit all proceeds, gains or other benefits actually or constructively received by the Employee from the exercise of stock options or vesting of restricted stock units issued pursuant to the Equity Award Agreements.

b.  The Employee expressly recognizes and agrees that the terms of this Agreement are reasonable and required to protect the legitimate business interests of the Company, that any breach of this Agreement by the Employee will result in immediate and irreparable harm to the Company not compensable by monetary damages, and that the Company shall be entitled to obtain injunctive relief in addition to all other relief in any court of competent jurisdiction, to enforce the terms of this Agreement, without having to prove or show any actual damages to the Company, and without the necessity of posting any bond or other security.

8.  **Return of Property**

At the Company's request, or upon termination of Employee's employment, whichever occurs first, Employee shall (a) immediately deliver to the Company all documents or media containing Confidential Information, any work product, or any copies or records thereof, or other Company information stored in any form or format whatsoever, (b) permanently erase all of the Confidential Information from any personal computer systems or devices, and (c) certify in writing that Employee has complied with the requirements of this Section.  Employee also agrees to sign an acknowledgment of his/her obligations under this Agreement.

9.  **Miscellaneous**

a.  Employee acknowledges (i) he/she was advised of Employee's right to consult with an attorney prior to signing this Agreement , (ii) that he/she has read, carefully considered, and understands this Agreement, (iii) that the Employee will retain Confidential Information of the Company by virtue of the Employee's employment; (iv) that the terms of this Agreement are fair and reasonable, required in order to protect and maintain the legitimate business interests of the Company, and were fully bargained for in good faith prior to commencing employment with the Company or during the period of Employee's employment in exchange for valuable consideration, (v) that he/she executes this Agreement voluntarily, and (vi) that this Agreement is not the product of fraud, duress or coercion.  Employee acknowledges that the terms of this Agreement, including those covenants in Section 1, do not constitute any impairment of the Employee's ability to pursue a livelihood during the Non-Competition Period.  To the extent that the terms and conditions of this Agreement, including those covenants in Section 1, are deemed to constitute an impairment of the Employee's ability to work within his or her field of expertise during the Non-Competition Period, the Employee hereby agrees that this Agreement provides fair consideration for such impairment and that the potential harm to the Company of the non-enforcement of these provisions outweighs any harm to employee caused by the enforcement of the restrictions by injunction or otherwise;

b.  The Employee further acknowledges that the amount of his/her compensation reflects, in part, his/her obligations and the Company's rights under this Agreement; that the Employee has no expectation of any additional compensation, royalties or other payment of any kind not otherwise referenced herein in connection herewith; and that the Employee will not be subject to undue hardship by reason of his/her full compliance with the terms and conditions of this Agreement or the Company's enforcement thereof;

c.  This Agreement contains the entire understanding and agreement between the parties hereto with respect to the matters referred to in this Agreement.  This Agreement may be altered, amended or superseded only by an agreement in writing, signed by the parties or the party against whom enforcement of any waiver, change, modification, extension or discharge is sought.  No failure by the Company to insist on strict compliance with any of the terms herein, and no delay or omission by the Company in exercising any right under this Agreement will operate as a waiver of such terms.  A written waiver or consent given by the Company on any one

DocuSign Envelope ID: 21773B70-480D-4607-A76E-12ECD028F0A4

occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion;

d.   The provisions of this Agreement are severable and, in the event that any court of competent jurisdiction shall determine that any provision or covenant herein contained is invalid, or overly broad or unreasonable under applicable law, in whole or in part, the parties request that the court revise said provision or covenant so as to provide the maximum benefit allowed by law to the Company, and that the remaining provisions or covenants remain unchanged and enforceable.  In the event that the court determines that Section 1 of this Agreement would be enforceable except for reason of lack of adequate consideration herein, then the court is further hereby requested to determine such additional consideration such that, if paid by the Company to the Employee, the court would find Section 1 binding and enforceable upon the Employee.  The Company shall then have the sole right to pay such additional consideration to the Employee, and failing such payment, the Company shall then abide by the court's determination;

e.   This Agreement shall be binding upon the Employee, without regard to the duration of his or her employment by the Company or the reasons for the termination of such employment, which termination may be voluntary or involuntary, and which may be with or without cause.  Nothing stated in this Agreement shall in any way alter or modify the Employee's "at will" employment status with the Company.  This Agreement shall also be binding upon the Employee's administrators, executors, personal representatives, heirs, and assigns, and shall inure to the benefit of the Company, its successors and assigns;

f.   One original signed copy of this Agreement shall be executed and maintained on file by the Company.  The Employee shall receive a copy of the signed original which shall be considered to have the force and effect of the original;

g.   All issues concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by, construed and enforced in accordance with the laws of the State in which Employee has his or her primary residence at the time of signing this Agreement, without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any other jurisdiction;

h.   Defend Trade Secrets Act of 2016.  Employee acknowledges receipt of the following notice under 18 U.S.C § 1833(b)(1): "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal;" and

i.   This Agreement shall be deemed effective as of the first date of employment of the Employee by the Company.  In the event this Agreement is executed by the Employee on a date following the first date of employment of the Employee by the Company, the Agreement shall be deemed effective as of the date executed by the Employee.

The above is hereby agreed and accepted effective as of the date first written above.

Employee:      *Justin Brown*
(Employee Signature)

Cognex Corporation:

Justin Brown
(Printed Name)

By:  *Sheila M. DiPalma*
(Authorized Company Signature)

Address:      37310 N 104th Place Scottsdale, AZ 85262

Senior Vice President of Sales

DocuSign Envelope ID: 21773B70-480D-4607-A76E-12ECD028F0A4

## Exhibit 1

<u>Description of the Employee's prior detailed knowledge of, experience with, or training in the specification, design, manufacture or marketing of machine vision systems:</u>

[Please see Exhibit 1 from previously executed non-compete]

The information set forth in this Exhibit 1 is agreed to and understood by:

Employee: ___JB___
(Please initial)

Company: ___SMD___
(Please initial)

**DocuSign**

## Certificate Of Completion

Envelope Id: 21773B70480D4607A76E12ECD028F0A4
Subject: Please DocuSign: Employee Invention Non-Disclosure and Non-Compete Agreement
Source Envelope:
Document Pages: 6
Certificate Pages: 5
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-05:00) Eastern Time (US & Canada)

Signatures: 2
Initials: 2

Status: Completed

Envelope Originator:
Leah Levy
1 Vision Dr.
Natick, MA  01760
leah.levy@cognex.com
IP Address: 108.20.205.76

## Record Tracking

Status: Original
    May 14, 2021 | 14:30

Holder: Leah Levy
    leah.levy@cognex.com

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| Justin Brown | *Justin Brown* | Sent: May 14, 2021 | 14:33 |
| Justin.Brown@cognex.com | 2A5499D8CBBE4FD... | Viewed: May 14, 2021 | 16:06 |
| VP of Sales | | Signed: May 17, 2021 | 15:44 |
| Cognex Corporation | | |
| Security Level: Email, Account Authentication (None) | Signature Adoption: Pre-selected Style Using IP Address: 198.232.30.232 | |

Electronic Record and Signature Disclosure:
    Accepted: Jan 23, 2019 | 18:14
    ID: c89bdfe8-14c6-4a06-bbd5-91723004121a

| | | |
|---|---|---|
| Sheila M. DiPalma | *Sheila M. DiPalma* | Sent: May 17, 2021 | 15:44 |
| sheila.dipalma@cognex.com | 389AC11A50A0466... | Viewed: May 17, 2021 | 16:40 |
| EVP Employee Services | | Signed: May 17, 2021 | 16:40 |
| Security Level: Email, Account Authentication (None) | Signature Adoption: Pre-selected Style Using IP Address: 198.232.30.235 | |

Electronic Record and Signature Disclosure:
    Accepted: Mar 25, 2019 | 07:47
    ID: 0f068252-b818-4e4e-87d7-df82fcf244f9

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | May 14, 2021 | 14:33 |
| Certified Delivered | Security Checked | May 17, 2021 | 16:40 |

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Signing Complete | Security Checked | May 17, 2021 \| 16:40 |
| Completed | Security Checked | May 17, 2021 \| 16:40 |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: Jan 23, 2019 | 11:09
Parties agreed to: Justin Brown, Sheila M. DiPalma

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Cognex Corporation (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Cognex Corporation:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: privacy@cognex.com

**To advise Cognex Corporation of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at leah.levy@cognex.com and in the body of such request you must state: your previous email address, your new email address.  We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Cognex Corporation**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to leah.levy@cognex.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Cognex Corporation**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to privacy@cognex.com and in the body of such request you must state your email, full name, mailing address, and telephone number. Name, email address.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Cognex Corporation as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Cognex Corporation during the course of your relationship with Cognex Corporation.

# EXHIBIT D



March 21, 2022

Covariant, Inc.
Attn: Xi Chen, CEO
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

**RE: IMMEDIATE CEASE AND DESIST DEMAND BY COGNEX CORPORATION ("COGNEX") REGARDING EMPLOYMENT OF JUSTIN BROWN**

Mr. Chen:

It has come to Cognex's attention that Justin Brown ("Mr. Brown"), a former Cognex employee, is employed by Covariant, Inc. ("Covariant") as Head of Sales. Mr. Brown worked for Cognex in various sales leadership roles, from May 23, 2010 until his voluntary resignation on March 1, 2022, most recently as Senior Vice President, Global Logistics Sales.

Mr. Brown has signed multiple restrictive covenant agreements with Cognex during his tenure, most recently the Employee Invention, Non-Disclosure and Non-Competition Agreement dated May 24, 2021 (the "Employee Agreement"), which contains non-disclosure, non-competition, and non-solicitation provisions that survived the termination of Mr. Brown's employment with Cognex. Based on the nature of Covariant's business and the position Mr. Brown holds within Covariant, Mr. Brown is in direct violation of the terms of the Employee Agreement.

**This letter serves to inform you of Mr. Brown's continuing obligations to Cognex and to demand that you cease and desist any interference with Mr. Brown's compliance with his obligations under the Employee Agreement.**

Cognex has a protectable interest in prohibiting Mr. Brown from performing competitive services for a competitor. In addition to his contractual obligations set out in the Employee Agreement, this interest further arises from his past work with Cognex, the goodwill he developed on Cognex's behalf and his knowledge of Cognex trade secrets. During his employment with Cognex, Mr. Brown had direct access to, became knowledgeable of, and utilized highly sensitive confidential and proprietary information related to Cognex's business. All such information and trade secrets are protectable under the Employee Agreement as well as under state and federal laws.

Specifically, in Section 1 of the Employee Agreement, Mr. Brown agreed not to engage as an employee in any business competitive with Cognex's business. Section 1 states:

*"Business of the Company" is defined as the development, marketing, selling or servicing of machine vision systems or bar code readers;*

*[D]uring the term of Employee's employment and for the eighteen (18) month period following the effective date of Employee's separation ("Separation Date"), for any reason, from the Company (the "Non-Competition Period"), Employee shall not, directly or indirectly, engage in any Prohibited Activity within the area where Employee performed services for the Company during the two-year period prior to Employee's Separation Date or for any of the Company's Competitors (as defined in Section 1(c) below)... and provided, however, that if the Employee violates the terms of this Section, the Non-Competition Period will begin to run from the first date on which Employee ceases to be in violation of his/her obligations under this Section;...*

# COGNEX

*"Prohibited Activity" is (i) activity engaged in by Employee for a Competitor (as defined below) as an employee, employer, owner, operator, manager, advisor, consultant, agent, partner, director, stockholder, officer, volunteer, intern or in any other similar capacity, where the activity is similar to that engaged in by the Employee for the Company; (ii) providing services to a Competitor similar to those performed by Employee on behalf of the Company; and (iii) activity by the Employee that may require or inevitably require disclosure of trade secrets, proprietary information or Confidential Information, as defined below. For the purposes of this Non-Competition Section, a "Competitor" is a person or entity engaged in the Business of the Company or which provides services or products substantially similar to the Business of the Company...*

Mr. Brown's Employee Agreement also contains explicit confidentiality and non-solicitation obligations. Again, these obligations survive the termination of Mr. Brown's employment with Cognex. State law also imposes on Mr. Brown a continuing duty of loyalty, which prohibits him from disclosing Cognex's confidential or trade secret information at any time during or after his employment with Cognex.

Cognex takes its business, confidential, proprietary, and trade secret information seriously, and will take all necessary and appropriate steps to prevent any misappropriation or disclosure of its trade secrets or confidential information, or any breach of contracts, tortious interference with its business relations, or usurpation of its corporate opportunities. Cognex is simultaneously directing correspondence to Mr. Brown demanding his immediate compliance with the Employee Agreement. A copy of Cognex's letter to Mr. Brown is enclosed.

Cognex expects that Covariant will respect these obligations and refrain from inducing Mr. Brown to breach them. Cognex is prepared to take any and all action necessary against Mr. Brown and Covariant to enjoin any further breach of the Employee Agreement.

**We therefore demand that Covariant take the following actions and respond to Cognex in writing confirming the same:**

1. **Immediately terminate its employment relationship with Mr. Brown; and**
2. **Take proactive measures to avoid receiving services, either directly or indirectly, from Mr. Brown until conclusion of the Non-Competition Period, as extended pursuant to the Employee Agreement.**

If we have not received your written confirmation by 5:00pm Eastern Time on March 25, 2022, Cognex will, without further notice, take all such actions as it deems necessary in its sole discretion to protect its interests, including pursuing all available remedies at law.

If you would like to discuss this matter directly, please contact me by phone at (508) 650-3356 or by email at sheila.dipalma@cognex.com.

We expect your prompt and complete cooperation on this matter.

Sincerely,

Sheila M. DiPalma
Executive Vice President, Employee Services

Encl.



*VIA OVERNIGHT MAIL*

March 21, 2022

Justin Brown
37310 N 104th Place
Scottsdale, AZ 85262

### RE: IMMEDIATE CEASE AND DESIST DEMAND

Justin:

It has come to our attention that you have accepted employment with Covariant, Inc. ("Covariant"), a direct competitor of Cognex Corporation ("Cognex"). On May 14, 2021, you signed an Employee Invention, Non-Disclosure and Non-Competition Agreement (the "Employee Agreement"), a copy of which is enclosed with this letter for your reference. The Employee Agreement contains explicit non-disclosure, non-competition and non-solicitation provisions that survived the termination of your employment with Cognex. Your prior agreements with Cognex, dated May 23, 2010 and October 24, 2015, contained similar provisions.

**We write to remind you of your obligations under the Employee Agreement and to demand your immediate separation from Covariant in compliance with these obligations.**

As the Employee Agreement makes clear, Cognex has a protectable interest in prohibiting you from performing competitive services for a direct competitor. This interest arises from your past work with Cognex, the goodwill you developed on Cognex's behalf and your knowledge of Cognex trade secrets. During your employment with Cognex, you had direct access to, became knowledgeable of, and utilized highly-sensitive confidential and proprietary information related to Cognex's business. All such information and trade secrets are protectable under your Employee Agreement as well as under state and federal laws.

*Violation of Non-Compete Obligations*

In Section 1 of the Employee Agreement, you agreed not to engage as an employee in any business competitive with Cognex's business. Section 1 states:

> *"Business of the Company" is defined as the development, marketing, selling or servicing of machine vision systems or bar code readers;*
>
> *[D]uring the term of Employee's employment and for the eighteen (18) month period following the effective date of Employee's separation ("Separation Date"), for any reason, from the Company (the "Non-Competition Period"), Employee shall not, directly or indirectly, engage in any Prohibited Activity within the area where Employee performed services for the Company during the two-year period prior to Employee's Separation Date or for any of the Company's Competitors (as defined in Section 1(c) below)... and provided, however, that if the Employee violates the terms of this Section, the Non-Competition Period will begin to run from the first date on which Employee ceases to be in violation of his/her obligations under this Section;...*
>
> *"Prohibited Activity" is (i) activity engaged in by Employee for a Competitor (as defined below) as an employee, employer, owner, operator manager, advisor, consultant, agent, partner, director, stockholder, officer, volunteer, intern or in any other similar capacity, where the activity is similar to*

# COGNEX

*that engaged in by the Employee for the Company; (ii) providing services to a Competitor similar to those performed by Employee on behalf of the Company; and (iii) activity by the Employee that may require or inevitably require disclosure of trade secrets, proprietary information or Confidential Information, as defined below. For the purposes of this Non-Competition Section, a "Competitor" is a person or entity engaged in the Business of the Company or which provides services or products substantially similar to the Business of the Company;*

As part of the exit interview on February 25, 2022, you acknowledged and confirmed the existence of the Employee Agreement and your obligations thereunder.

**Based on the foregoing, we demand that you immediately cease and desist from all breaches of the Employee Agreement, including your new employment with Covariant.**

In addition to your obligations to Cognex, Covariant also has a legal obligation not to interfere with the Employee Agreement or with Cognex's existing business relationships. We will be reaching out to Covariant separately to advise them of your Employee Agreement and remind them of the potential liability that they face should they continue to employ you.

Please confirm your receipt of this notice and your intent to fully comply with the terms of your Employee Agreement. Specifically:

1. Immediately terminate your employment with Covariant, and provide Cognex with a copy of your employment separation documents;
2. Immediately cease to provide any form of service to Covariant; and
3. Cease and desist from using or disclosing Cognex's trade secrets and/or confidential information.

If we have not received your written confirmation of compliance with the above by 5:00pm Eastern Time on March 25, 2022, Cognex will, without further notice, take all such actions as it deems necessary in its sole discretion to protect its interests, including pursuing all available remedies at law.

We look forward to your prompt and complete cooperation on this matter.

Sincerely,

Sheila M. DiPalma
Executive Vice President, Employee Services

Encl.

DocuSign Envelope ID: 21773B70-480D-4607-A76E-12ECD028F0A4

# COGNEX

### EMPLOYEE INVENTION, NON-DISCLOSURE AND NON-COMPETITION AGREEMENT

This AGREEMENT is entered into this 14th day of May, 2021, by and between Cognex Corporation, a Massachusetts corporation with a principal place of business at One Vision Drive, Natick, Massachusetts 01760-2059 and any of its affiliates, subsidiaries, successors and assigns as presently constituted and as may be established in the future (the "Company") and Justin Brown, the undersigned employee of the Company (the "Employee").

IN CONSIDERATION of the promotion of Employee to Senior Vice President, Global Logistics Sales by the Company, in recognition of the fact that the Employee has access to certain trade secrets and/or confidential and proprietary information in conjunction with his or her employment with the Company, in consideration of the wages, equity based awards and other benefits provided to the Employee by the Company during his/her period of employment, and for other good and valuable consideration as specifically set forth below, the receipt and sufficiency of which are hereby acknowledged by the Employee, the Employee hereby agrees as follows:

1. **Non-Competition**

   a. For as long as Employee is employed by the Company, Employee shall devote his/her full time and efforts to the Company and shall not engage, participate or invest, directly or indirectly, in any capacity in any business or activity that is in competition with the Business of the Company.  For the purposes of this Non-Competition Section, "Business of the Company" is defined as the development, marketing, selling or servicing of machine vision systems or bar code readers;

   b. Because of the Company's legitimate business interest as described herein and the good and valuable consideration offered to the Employee, during the term of Employee's employment and for the eighteen (18) month period following the effective date of Employee's separation ("Separation Date"), for any reason, from the Company (the "Non-Competition Period"), Employee shall not, directly or indirectly, engage in any Prohibited Activity within the area where Employee performed services for the Company during the two-year period prior to Employee's Separation Date or for any of the Company's Competitors (as defined in Section 1(c) below), provided, however, that if Employee was employed by the Company for less than one year, the Non-Competition Period shall continue for the greater of six months or the length of Employee's employment; and provided, however, that if the Employee violates the terms of this Section, the Non-Competition Period will begin to run from the first date on which Employee ceases to be in violation of his/her obligations under this Section;

   c. For purposes of this Non-Competition Section, "Prohibited Activity" is (i) activity engaged in by Employee for a Competitor (as defined below) as an employee, employer, owner, operator manager, advisor, consultant, agent, partner, director, stockholder, officer, volunteer, intern or in any other similar capacity, where the activity is similar to that engaged in by the Employee for the Company; (ii) providing services to a Competitor similar to those performed by Employee on behalf of the Company; and (iii) activity by the Employee that may require or inevitably require disclosure of trade secrets, proprietary information or Confidential Information, as defined below.  For the purposes of this Non-Competition Section, a "Competitor" is a person or entity engaged in the Business of the Company or which provides services or products substantially similar to the Business of the Company;

   d. Employee's aggregate ownership as the result of open market purchases of two (2%) percent or less of the capital stock of a Competitor or of an entity engaged in the Business of the Company, the stock of which is regularly traded on a stock exchange or in the over-the-counter market and where the Employee has no involvement in such entity or its business activities other than exercising his or her voting rights as an equity holder, shall not constitute a violation of this provision; and

   e. Employee acknowledges and agrees that this Section 1 "Non-Competition" is reasonable and intended to protect the Company's Confidential Information, relationships with customers, and goodwill.

2. **Confidentiality of Company Confidential Information**

   Employee acknowledges that the development and/or acquisition of Confidential Information by the Company is the result of great effort and expense by the Company, that the Company's Confidential Information is essential to its success, competitiveness and profitability, and that it is critical to the Company's business reputation and success that Confidential Information, as described below, be maintained in strict confidence.  Accordingly, Employee agrees that during his/her employment with the Company and thereafter, Employee shall not use for his/her own benefit or for the benefit of any other person or entity, divulge or disclose to anyone except for persons within the Company

DocuSign Envelope ID: 21773B70-480D-4607-A76E-12ECD028F0A4

whose positions require them to know it, any information not already lawfully available to the public concerning the Company or any information constituting a trade secret pursuant to Massachusetts law (collectively, "Confidential Information"). Confidential Information includes, without limitation, any trade secrets, technical data, design, pattern, formula, process, methods, computer program, source code, object code, algorithm, subroutine, manual, product specification, or plan for a new, revised, enhanced, modified or existing product; operational and functional features and limitations of the Company's software or other products; any business, marketing, financial, pricing or other sales-related data; information regarding the present or future business products of the Company; information regarding employees including contact information, employee lists, organizational charts, information concerning particular employee skill sets, technical and business knowledge, and compensation; and any information concerning the particular needs of clients or customers and their buying patterns, price sensitivities, key decision makers (and the contact information for such individuals), product needs, product specifications, request for proposal and the responses thereto. The foregoing shall be deemed "Confidential" regardless of whether tangible or intangible, memorialized electronically, graphically, or in writing, or labeled "Confidential." Nothing in this Section 2 is intended to limit Employee's rights under Section 7 of the National Labor Relations Act.

Without limiting the above provisions, Employee shall immediately notify the Company of the occurrence of (i) the disclosure or use of any Confidential Information in a manner inconsistent with the provisions of this Agreement, or as otherwise not expressly authorized in writing by the Company; (ii) a request by anyone to examine, inspect or copy Confidential Information; or (iii) any attempt to serve, or the service of, a court order, subpoena, or summons upon Employee that purports to require the production or disclosure of any Confidential Information; and Employee shall cooperate with the Company and its Customers and other third parties in an effort to oppose such request, subpoena order or summons.

3.  **Confidential Information of Third Parties**

Employee agrees that, while working for the Company, he or she shall not use or disclose to any employee or representative of the Company any trade secrets or confidential or proprietary information that he or she may have learned while working for a former employer or client or while providing services to any other person or entity. Employee further acknowledges and confirms that he or she has not kept or brought to the Company any documents of any former employer, person or entity to whom Employee provided services that may contain trade secrets or proprietary or confidential information and agrees that Employee shall not use any such trade secrets or proprietary or confidential information in connection with his or her employment with the Company. Employee understands that use of any trade secrets or confidential or proprietary information that he or she may have learned while working for a former employer or while providing services to any other person or entity in connection with his/her employment by the Company shall constitute grounds for termination for Cause.

4.  **Non-Solicitation**

    a.  During Employee's employment and for the eighteen (18) month period following his/her separation from employment (the "Non-Solicitation Period"), for any reason, from the Company, Employee agrees that he/she will not, either on his/her own behalf or on behalf of any person or entity, directly or indirectly:  (i) solicit, or attempt to solicit, recruit or hire, any person who is, or was, during the one year period prior to Employee's Separation Date, or is during the Non-Solicitation Period, an employee, consultant or contractor of the Company, to terminate, alter or modify such person's relationship with the Company; (ii) solicit, accept from, or perform for any person or entity that is a customer of the Company as of the Employee's Separation Date, with which Employee had material contact during the two-year period prior to the Separation Date ("Customer") any business of the type performed or which could be performed by the Company for such Customer; or (iii) persuade any Customer to cease doing business with the Company or to reduce the amount or scope of business that such Customer has customarily done or is reasonably expected to do with the Company.  If the Employee violates the terms of this Section, the Non-Solicitation Period will begin to run from the first date on which Employee ceases to be in violation of his/her obligations under this Section; and

    b.  Employee acknowledges and agrees that this Section 4 "Non-Solicitation" is reasonable and intended to protect the Company's Confidential Information, established customer relationships and goodwill.

5.  **Ownership of Intellectual Property**

    a.  All developments are the property of the Company.  Except as provided herein, all Confidential Information, copyrights, works of authorship, mask works, trademarks, inventions, discoveries, developments, enhancements, designs, formulae, processes, procedures, methods, ideas and improvements (whether or not patentable), copyrightable works, and all writings, compilations, programs, documentation and reports related thereto (whether or not copyrightable), invented, created, discovered, developed, conceived, devised, prepared or otherwise made

DocuSign Envelope ID: 21773B70-480D-4607-A76E-12ECD028F0A4

by the Employee ("Inventions"), alone or with others, whether or not reduced to tangible form or reduced to practice during the period of Employee's employment with the Company, shall be the sole property of the Company from the moment of their invention, creation, discovery, development, conception, or preparation.  This shall not apply to an invention that Employee develops solely on his/her own time without using Company equipment, supplies, facilities, or Confidential Information except for those Inventions that either (i) relate at the time of conception or reduction to practice of the Invention to the Company's business, or to the actual or demonstrably anticipated research or development of the Company (or, for employees in jurisdictions with a different standard, to the fullest extent permitted by law); or (ii) are suggested by or result from any work performed by Employee for the Company;

b.  Employee agrees to disclose Inventions to the Company fully and in writing promptly after development, conception, invention, or discovery of the same, and at any time upon request, including the disclosure of any Inventions related thereto made, conceived, devised, discovered or prepared by the Employee after the termination of the Employee's employment with the Company which in any way arise from or are based upon any Company Confidential Information or for which the Company possesses a license.  Upon disclosure of an Invention by Employee, he/she agrees to execute a specific written assignment of the Invention to the Company.  The Employee further agrees assist the Company in any reasonable manner necessary to obtain for the Company's benefit patents or copyrights thereon in any and all countries, and to execute when requested patent or copyright applications and assignments thereof to the Company and any other documents deemed necessary by the Company to carry out the purposes of this Agreement, all without further consideration, but at the expense of the Company.  The obligations and undertakings stated in this section shall continue beyond Employee's separation from employment with the Company indefinitely regardless of the reason for such separation;

c.  Employee agrees to assign and hereby does assign to the Company all right, title and interest throughout the world in and to all Inventions.  Employee agrees that such Inventions shall constitute "work made for hire" as that term is used in the Copyright Law of the United States and hereby assigns to the Company all copyrights, patents and other proprietary rights Employee may have in any Inventions without any obligation on the part of the Company to pay royalties or any other consideration to Employee in respect of such Inventions;

d.  The Employee hereby grants to the Company a non-exclusive, perpetual, unlimited, irrevocable and fully paid, royalty free license, without additional compensation, of the Employee's rights to any invention, improvement or enhancement made, conceived, devised or discovered by the Employee prior to the Employee's employment by the Company and incorporated by the Employee in any work product produced by the Employee during his or her employment with the Company;

e.  Employee waives any rights he/she may have in any Inventions and, to the extent such waiver is ineffective under applicable law until an Invention is developed, conceived, created, invented or discovered, Employee agrees to waive such rights immediately upon the development, conception, creation, invention or discovery of such Invention;

f.  Employee hereby represents and warrants that (i) each, if any, Invention relating to his or her employment with the Company is original to the Employee; (ii) each such Invention does not and will not infringe upon or violate the copyrights, trademarks, service marks, patents or any other rights whatsoever of any third party; (iii) no third party has any rights in, to or arising out of, or in connection with, each such Invention or the rights granted herein; and (iv) the Company, its assigns and licensees, shall be free from all claims for fees, royalties, or other payments from all persons asserting any rights in, to, arising out of, or in connection with each such Invention or any rights therein; and

g.  Employee agrees that during and after his/her employment he/she will provide all assistance that the Company reasonably requests (without charge, but at no cost to Employee), to secure or enforce its rights throughout the world with respect to Inventions, including signing all necessary documents to secure or memorialize those rights. If Employee fails or refuses to sign documents necessary to secure or enforce the Company's rights, or if the Company cannot locate the Employee through the exercise of reasonable diligence, Employee irrevocably appoints the Company or its designee as Employee's attorney to sign such documents in Employee's name.

## 6.  Employee's Representation and Warranties

The Employee hereby represents and warrants to the Company that:

a.  Prior to his or her employment by the Company, he or she had no detailed knowledge of, experience with, or training in the specification, design, manufacture or marketing of machine vision systems other than as may be described in writing and attached hereto as Exhibit 1; and

DocuSign Envelope ID: 21773B70-480D-4607-A76E-12ECD028F0A4

b.  He or she is not a party to or in any way bound by any prior agreement whether with a prior employer or otherwise, which could in any way prohibit him or her from becoming an employee of the Company or from carrying out his or her obligations under this Agreement; and he or she acknowledges that he or she will be solely responsible for any costs and damages resulting from any violation of any such agreement and shall indemnify the Company from same.

7.  **Remedy for Breach/Relief**

a.  To the fullest extent permitted by law, consistent with the terms of the Cognex Corporation 2001 General Stock Option Plan (where applicable), the Cognex Corporation 2007 Stock Option and Incentive Plan, and related equity award agreements (collectively, the "Equity Award Agreements"), and in addition to all other rights and remedies available to Cognex at law or in equity, in the event Employee breaches Section 1 (Non-Competition) or Section 4 (Non-Solicitation) of this Agreement, Employee agrees to repay or forfeit all proceeds, gains or other benefits actually or constructively received by the Employee from the exercise of stock options or vesting of restricted stock units issued pursuant to the Equity Award Agreements.

b.  The Employee expressly recognizes and agrees that the terms of this Agreement are reasonable and required to protect the legitimate business interests of the Company, that any breach of this Agreement by the Employee will result in immediate and irreparable harm to the Company not compensable by monetary damages, and that the Company shall be entitled to obtain injunctive relief in addition to all other relief in any court of competent jurisdiction, to enforce the terms of this Agreement, without having to prove or show any actual damages to the Company, and without the necessity of posting any bond or other security.

8.  **Return of Property**

At the Company's request, or upon termination of Employee's employment, whichever occurs first, Employee shall (a) immediately deliver to the Company all documents or media containing Confidential Information, any work product, or any copies or records thereof, or other Company information stored in any form or format whatsoever, (b) permanently erase all of the Confidential Information from any personal computer systems or devices, and (c) certify in writing that Employee has complied with the requirements of this Section.  Employee also agrees to sign an acknowledgment of his/her obligations under this Agreement.

9.  **Miscellaneous**

a.  Employee acknowledges (i) he/she was advised of Employee's right to consult with an attorney prior to signing this Agreement , (ii) that he/she has read, carefully considered, and understands this Agreement, (iii) that the Employee will retain Confidential Information of the Company by virtue of the Employee's employment; (iv) that the terms of this Agreement are fair and reasonable, required in order to protect and maintain the legitimate business interests of the Company, and were fully bargained for in good faith prior to commencing employment with the Company or during the period of Employee's employment in exchange for valuable consideration, (v) that he/she executes this Agreement voluntarily, and (vi) that this Agreement is not the product of fraud, duress or coercion.  Employee acknowledges that the terms of this Agreement, including those covenants in Section 1, do not constitute any impairment of the Employee's ability to pursue a livelihood during the Non-Competition Period.  To the extent that the terms and conditions of this Agreement, including those covenants in Section 1, are deemed to constitute an impairment of the Employee's ability to work within his or her field of expertise during the Non-Competition Period, the Employee hereby agrees that this Agreement provides fair consideration for such impairment and that the potential harm to the Company of the non-enforcement of these provisions outweighs any harm to employee caused by the enforcement of the restrictions by injunction or otherwise;

b.  The Employee further acknowledges that the amount of his/her compensation reflects, in part, his/her obligations and the Company's rights under this Agreement; that the Employee has no expectation of any additional compensation, royalties or other payment of any kind not otherwise referenced herein in connection herewith; and that the Employee will not be subject to undue hardship by reason of his/her full compliance with the terms and conditions of this Agreement or the Company's enforcement thereof;

c.  This Agreement contains the entire understanding and agreement between the parties hereto with respect to the matters referred to in this Agreement.  This Agreement may be altered, amended or superseded only by an agreement in writing, signed by the parties or the party against whom enforcement of any waiver, change, modification, extension or discharge is sought.  No failure for the Company to insist on strict compliance with any of the terms herein, and no delay or omission by the Company in exercising any right under this Agreement will operate as a waiver of such terms.  A written waiver or consent given by the Company on any one

DocuSign Envelope ID: 21773B70-480D-4607-A76E-12ECD028F0A4

occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion;

d.  The provisions of this Agreement are severable and, in the event that any court of competent jurisdiction shall determine that any provision or covenant herein contained is invalid, or overly broad or unreasonable under applicable law, in whole or in part, the parties request that the court revise said provision or covenant so as to provide the maximum benefit allowed by law to the Company, and that the remaining provisions or covenants remain unchanged and enforceable.  In the event that the court determines that Section 1 of this Agreement would be enforceable except for reason of lack of adequate consideration herein, then the court is further hereby requested to determine such additional consideration such that, if paid by the Company to the Employee, the court would find Section 1 binding and enforceable upon the Employee.  The Company shall then have the sole right to pay such additional consideration to the Employee, and failing such payment, the Company shall then abide by the court's determination;

e.  This Agreement shall be binding upon the Employee, without regard to the duration of his or her employment by the Company or the reasons for the termination of such employment, which termination may be voluntary or involuntary, and which may be with or without cause.  Nothing stated in this Agreement shall in any way alter or modify the Employee's "at will" employment status with the Company.  This Agreement shall also be binding upon the Employee's administrators, executors, personal representatives, heirs, and assigns, and shall inure to the benefit of the Company, its successors and assigns;

f.  One original signed copy of this Agreement shall be executed and maintained on file by the Company.  The Employee shall receive a copy of the signed original which shall be considered to have the force and effect of the original;

g.  All issues concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by, construed and enforced in accordance with the laws of the State in which Employee has his or her primary residence at the time of signing this Agreement, without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any other jurisdiction;

h.  Defend Trade Secrets Act of 2016.  Employee acknowledges receipt of the following notice under 18 U.S.C § 1833(b)(1): "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal;" and

i.  This Agreement shall be deemed effective as of the first date of employment of the Employee by the Company.  In the event this Agreement is executed by the Employee on a date following the first date of employment of the Employee by the Company, the Agreement shall be deemed effective as of the date executed by the Employee.

The above is hereby agreed and accepted effective as of the date first written above.

Employee:   *DocuSigned by:*  Justin Brown
(Employee Signature)

Justin Brown
(Printed Name)

Address:    37310 N 104th Place Scottsdale, AZ 85262

Cognex Corporation:

By:  *DocuSigned by:*  Sheila M. DiPalma
(Authorized Company Signature)

Senior Vice President of Sales

DocuSign Envelope ID: 21773B70-480D-4607-A76E-12ECD028F0A4

<u>**Exhibit 1**</u>

<u>Description of the Employee's prior detailed knowledge of, experience with, or training in the specification, design, manufacture or marketing of machine vision systems:</u>

[Please see Exhibit 1 from previously executed non-compete]

The information set forth in this Exhibit 1 is agreed to and understood by:

Employee: _____         Company: _____
(Please initial)                          (Please initial)

**DocuSign**

## Certificate Of Completion

Envelope Id: 21773B70480D4607A76E12ECD028F0A4                                    Status: Completed
Subject: Please DocuSign: Employee Invention Non-Disclosure and Non-Compete Agreement
Source Envelope:
Document Pages: 6                          Signatures: 2                          Envelope Originator:
Certificate Pages: 5                        Initials: 2                            Leah Levy
AutoNav: Enabled                                                                  1 Vision Dr.
EnvelopeId Stamping: Enabled                                                      Natick, MA  01760
Time Zone: (UTC-05:00) Eastern Time (US & Canada)                                 leah.levy@cognex.com
                                                                                  IP Address: 108.20.205.76

## Record Tracking

Status: Original                          Holder: Leah Levy                      Location: DocuSign
    May 14, 2021 | 14:30                       leah.levy@cognex.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| Justin Brown | *Justin Brown* | Sent: May 14, 2021 \| 14:33 |
| Justin.Brown@cognex.com | 2A5490D8CBBE4FD... | Viewed: May 14, 2021 \| 16:06 |
| VP of Sales | | Signed: May 17, 2021 \| 15:44 |
| Cognex Corporation | | |
| Security Level: Email, Account Authentication (None) | Signature Adoption: Pre-selected Style<br>Using IP Address: 198.232.30.232 | |

**Electronic Record and Signature Disclosure:**
    Accepted: Jan 23, 2019 | 18:14
    ID: c89bdfe8-14c6-4a06-bbd5-91723004121a

| | | |
|---|---|---|
| Sheila M. DiPalma | *Sheila M. DiPalma* | Sent: May 17, 2021 \| 15:44 |
| sheila.dipalma@cognex.com | 386AC11A50A8460... | Viewed: May 17, 2021 \| 16:40 |
| EVP Employee Services | | Signed: May 17, 2021 \| 16:40 |
| Security Level: Email, Account Authentication (None) | Signature Adoption: Pre-selected Style<br>Using IP Address: 198.232.30.235 | |

**Electronic Record and Signature Disclosure:**
    Accepted: Mar 25, 2019 | 07:47
    ID: 0f068252-b818-4e4e-87d7-df82fcf244f9

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | May 14, 2021 \| 14:33 |
| Certified Delivered | Security Checked | May 17, 2021 \| 16:40 |

| Envelope Summary Events | Status | Timestamps |
| --- | --- | --- |
| Signing Complete | Security Checked | May 17, 2021 | 16:40 |
| Completed | Security Checked | May 17, 2021 | 16:40 |

| Payment Events | Status | Timestamps |
| --- | --- | --- |

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: Jan 23, 2019 | 11:09
Parties agreed to: Justin Brown, Sheila M. DiPalma

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Cognex Corporation (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Cognex Corporation:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: privacy@cognex.com

**To advise Cognex Corporation of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at leah.levy@cognex.com and in the body of such request you must state: your previous email address, your new email address.  We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Cognex Corporation**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to leah.levy@cognex.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Cognex Corporation**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to privacy@cognex.com and in the body of such request you must state your email, full name, mailing address, and telephone number. Name, email address.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

## Required hardware and software

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

## Acknowledging your access and consent to receive and sign documents electronically

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Cognex Corporation as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Cognex Corporation during the course of your relationship with Cognex Corporation.